**Wilfred KEYES, et al., Plaintiffs,**

**Congress of Hispanic Educators, et al., Plaintiffs-Intervenors,**

v.

**SCHOOL DISTRICT NO. 1, DENVER, COLORADO, et al., Defendants.**

Civ. A. No. C–1499.

United States District Court,
D. Colorado.

Oct. 6, 1987.

Gordon G. Greiner, Holland & Hart, Denver, Colo., James M. Nabritt, III, New York City, for plaintiffs.

Antonia Hernandez, Norma V. Cantu, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., Kenneth Siegal, Kenneth Salazar, Sherman & Howard, Denver, Colo., for plaintiffs-intervenors.

Michael H. Jackson, Semple & Jackson, Denver, Colo., Phil C. Neal, Neal, Gerber & Eisenberg, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

In the Memorandum Opinion and Order entered June 3, 1985, *Keyes v. School District No. 1, Denver, Colo.,* 609 F.Supp. 1491 (D.Colo.1985), this court determined that the remedial phase of this desegregation case had not been completed and, therefore, denied the defendants' motion to declare the District unitary and terminate jurisdiction. After the parties' unsuccessful attempts to reach a settlement, an Order For Further Proceedings was entered on October 29, 1985, directing the District to submit plans for achieving unitary status. The defendants and plaintiffs submitted their respective proposals for further remedial action, resulting in the Memorandum Opinion and Order of February 25, 1987, 653 F.Supp. 1536 (D.Colo.1987). That decision recognized the plaintiffs' and plaintiff-intervenors' (plaintiffs) skepticism about the concern, commitment and capacity of the defendants to achieve and maintain a unitary system in Denver, Colorado, given the history of this litigation. None-

theless, this court refused to grant the further relief sought by the plaintiffs and accepted the defendants' approach in the matters of: (1) Barrett, Harrington and Mitchell elementary schools, (2) the "hardship" transfer policy, (3) faculty assignments, and (4) plans for implementation of Resolution 2233. Additionally, this court rejected the plaintiffs' proposed data collection, monitoring and reporting requirements, relying on the defendants to establish and implement sufficient data collection and monitoring to demonstrate the effectiveness of their proposals when called upon at an appropriate time.

This court also looked to the future and recognized the need for modification of the existing court orders to relax court control and give the defendants greater freedom to respond to changing circumstances and developing needs in the educational system. Accordingly, the parties were asked to submit proposals for an interim decree to replace existing orders. Those suggested modifications were received and a hearing was held on June 24, 1987. The proposals, the memoranda concerning them and the arguments of counsel at the hearing have been carefully considered.

The essential difference between the parties in approaching the task at hand is that the defendants have asked the court to establish standards which will provide guidance for the District in taking the necessary actions and which will also provide a measurement for compliance. Thus, the defendants suggest that changes in attendance zones, assignments to schools, and grade-level structure from the student assignment plan in effect for the 1986–87 school year not be made without prior court approval if the projected effect would be to cause a school's minority percentage to move five percentage points or more further away from the then-current district-wide average for the level (elementary, middle or high school) than in the year preceding the proposed change. Additionally, the defendants suggest that no new magnet school or magnet program be established unless enrollment is controlled so that the anglo and minority enrollments, respectively, are at least 40% of the total enrollment within a reasonable time. The defendants also suggest that prior court approval must be obtained for any enlargement of existing school facilities, construction of new schools, or the closing of any schools.

The plaintiffs contend that the defendants' request for specific judicial directives demonstrates their reluctance to accept responsibility to eradicate the effects of past segregation, and to assure that changes in policies, practices and programs will not serve to reestablish a dual school system. The defendants' reliance on the court creates doubt about their ability and willingness to meet the constitutional mandate of equal educational opportunity.

The injunctive decree must meet the requirements of Rule 65(d) of the Federal Rules of Civil Procedure and, yet, that requirement of specificity should not be permitted to stifle the creative energy of those who plan, supervise and operate the District, or to supplant their authority to govern. The task, therefore, is to develop a decree which strikes a balance between rigidity and vagueness. The principal purpose is to enable the defendants to operate the school system under general remedial standards, rather than specific judicial directives. This interim decree removes obsolete provisions of existing orders, relinquishes reporting requirements, and eliminates the need for prior court approval before making changes in the District's policies, practices and programs. The defendants are expected to act on their own initiative, without prior court approval, to make those changes in the student assignment plan of attendance zones, pairings, magnet schools or programs, satellite zones and grade level structure which the Board determines to be necessary to meet the educational needs of the people of Denver.

The interim decree is a necessary step toward a final decree which will terminate jurisdiction. The legal principles involved continue to be those articulated by Chief Justice Burger for a unanimous Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct.

1267, 28 L.Ed.2d 554 (1971). The final decree will be formed under the guidance of *Dowell v. Board of Education of Oklahoma City*, 795 F.2d 1516 (10th Cir.1986). The timing of a final order terminating the court's supervisory jurisdiction will be directly related to the defendants' performance under this interim decree. It will be the defendants' duty to demonstrate that students have not and will not be denied the opportunity to attend schools of like quality, facilities and staffs because of their race, color or ethnicity. When that has been done, the remedial stage of this case will be concluded and a final decree will be entered to give guidance for the future.

■■■ The defendants object to the use of the term "racially identifiable schools" as too indefinite and express apprehension that this may be construed to mean an affirmative duty broader than that required by the Equal Protection Clause of the Fourteenth Amendment to the Constitution. This concern is eliminated by the requirement that racial identifiability or substantial disproportion must not result from the defendants' actions. What is enjoined is governmental action which results in racially identifiable schools, as discussed in *Swann*. In the evolution of the law since *Brown v. Board of Education*, the Supreme Court has indicated in the opinions for the majority in *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), and in *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), that some discriminatory intent must be shown to prove a violation of the constitutional requirement that educational opportunity must be equally available. That intent is not, however, measured by the good faith and well meaning of individual Board members or of the persons who carry out the policies and programs directed by the Board. The intent is an institutional intent which can be proved only by circumstantial evidence. What the District does in the operation of its schools will control over what the Board says in its resolutions. In the remedial stage of a school desegregation case, the court must be concerned with the affirmative duty to eradicate the effects of past intentional governmental discrimination. When unitary status is achieved, court supervision can be removed only when it is reasonably certain that future actions will be free from institutional discriminatory intent.

Upon the foregoing, it is now

ORDERED AND ADJUDGED:

1. The defendants, their agents, officers, employees and successors and all those in active concert and participation with them, are permanently enjoined from discriminating on the basis of race, color or ethnicity in the operation of the school system. They shall continue to take action necessary to disestablish all school segregation, eliminate the effects of the former dual system and prevent resegregation.

2. The defendants are enjoined from operating schools or programs which are racially identifiable as a result of their actions. The Board is not required to maintain the current student assignment plan of attendance zones, pairings, magnet schools or programs, satellite zones and grade-level structure. Before making any changes, the Board must consider specific data showing the effect of such changes on the projected racial/ethnic composition of the student enrollment in any school affected by the proposed change. The Board must act to assure that such changes will not serve to reestablish a dual school system.

3. The constraints in paragraph 2 are applicable to future school construction and abandonment.

4. The duty imposed by the law and by this interim decree is the desegregation of schools and the maintenance of that condition. The defendants are directed to use their expertise and resources to comply with the constitutional requirement of equal educational opportunity for all who are entitled to the benefits of public education in Denver, Colorado.

5. The District retains the authority to initiate transfers for administrative reasons, including special education, bilingual education and programs to enhance voluntary integration. The defendants shall maintain an established policy to prevent

the frustration, hindrance or avoidance of a District student assignment plan through parent initiated transfers and shall use administrative procedures to investigate, validate and authorize transfer requests using criteria established by the Board. If transfers are sought on grounds of "hardship", race, color or ethnicity will not be a valid basis upon which to demonstrate "hardship". The defendants shall keep records of all transfers, the reasons therefor, the race, color or ethnicity of the student, and of the effects on the population of the transferee and transferor schools.

6. No student shall be segregated or discriminated against on account of race, color or ethnicity in any service, facility, activity, or program (including extracurricular activities) conducted or sponsored by the school in which he or she is enrolled. All school use or school-sponsored use of athletic fields, meeting rooms, and all other school related services, facilities and activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race, color or ethnicity. The District shall provide its resources, services and facilities in an equitable, nondiscriminatory manner.

7. The defendants shall maintain programs and policies designed to identify and remedy the effects of past racial segregation.

8. The defendants shall provide the transportation services necessary to satisfy the requirements of this interim decree notwithstanding the provisions of Article IX, Section 8 of the Colorado Constitution.

9(A). The principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial or ethnic composition of a staff indicate that a school is intended for minority students or anglo students.

(B). Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color or ethnicity.

(C). Defendants are required to use an effective affirmative action plan for the hiring of minority teachers, staff and administrators with the goal of attaining a proportion which is consistent with the available labor force; the plan shall contain yearly timetables and a reasonable target date for the attainment of the affirmative action goals.

10. The District will continue to implement the provisions of the program for limited English proficiency students heretofore approved by the Court in the Language Rights Consent Decree of August 17, 1984. Nothing in this interim decree shall modify or affect the Language Rights Consent Decree of August 17, 1984, and the prior orders entered in this case relating thereto shall remain in full force and effect.

11. It is further provided that this interim decree is binding upon the defendant Superintendent of Schools, the defendant School Board, its members, agents, servants, employees, present and future, and upon those persons in active concert or participation with them who receive actual notice of this interim decree by personal service or otherwise.

12. This interim decree, except as provided herein, shall supersede all prior injunctive orders and shall control these proceedings until the entry of a final permanent injunction.