Wilfred KEYES, et al.,
Plaintiffs–Appellees,

and

Congress of Hispanic Educators, et al.,
Plaintiffs/Intervenors–Appellees,

v.

SCHOOL DISTRICT NO. 1, DENVER,
COLORADO, et al.,
Defendants–Appellants.

Nos. 85–2814, 87–2634.

United States Court of Appeals,
Tenth Circuit.

Jan. 30, 1990.

Phil C. Neal of Neal, Gerber, Eisenberg & Lurie, Chicago, Ill. (Michael H. Jackson of Semple & Jackson, Denver, Colo., with him on the brief) for defendants-appellants.

Gordon G. Greiner of Holland & Hart, Denver, Colo., for plaintiffs-appellees (James M. Nabrit, III, New York City, with him on the brief for plaintiffs-appellees; Norma V. Cantu of Mexican American Legal Defense and Educational Fund, Inc., San Antonio, Tex., and Peter Roos, San Francisco, Cal., with him on the brief for plaintiffs/intervenors-appellees).

Wm. Bradford Reynolds, Asst. Atty. Gen., Roger Clegg, Deputy Asst. Atty. Gen., and David K. Flynn, Atty. Dept. of Justice, Washington, D.C., filed a brief on behalf of the U.S. as amicus curiae.

Before LOGAN, SETH and ANDERSON, Circuit Judges.

LOGAN, Circuit Judge.

This is yet another chapter in the slow and acrimonious desegregation of Denver Public School District No. 1. In the district court, the school district moved for a declaration that it had attained unitary status and for the termination of this case and of the court's continuing jurisdiction over operation of the schools. The court denied both requests and later ordered the district to prepare a plan for further desegregation of certain schools and programs that it believed were preventing the district from attaining unitary status. Case number 85–2814 is the district's appeal from the court's denial of its motion for termination of continuing jurisdiction and from the court's later order. Case number 87–2634 is the district's appeal from the court's order approving the district's response but retaining jurisdiction, and its subsequent "interim decree" in which the court eliminated reporting requirements and mandated certain general desegregation actions. The court styled its "interim decree" an intermediate step towards a final, permanent injunction.

I

This case began in 1969 when plaintiffs, parents of children then attending the Denver public schools, sought an injunction against the school district's rescission of a proposed voluntary desegregation plan. Since that time the parties have made many trips to the courthouse, resulting in numerous opinions, including two by this court and one by the full Supreme Court of the United States.[1] In the instant appeals we are concerned primarily with the district court's actions in *Keyes XIV* through *Keyes XVII*.

From 1974, *see Keyes IX*, 380 F.Supp. 673, to the present the school district has operated under a court-ordered desegregation plan, which occasionally has been modified with the district court's approval. *See, e.g., Keyes XII*, 540 F.Supp. at 404; *Keyes XI*, 474 F.Supp. at 1276. In 1984 the

---

1. *See Keyes v. School Dist. No. 1*, 303 F.Supp. 279 (D.Colo.1969) (*Keyes I*), *modified*, 303 F.Supp. 289 (D.Colo.1969) (*Keyes II*), *order reinstated*, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (1969) (Brennan, J., in chambers) (*Keyes III*); *Keyes v. School Dist. No. 1*, 313 F.Supp. 61 (D.Colo.1970) (*Keyes IV*); *Keyes v. School Dist. No. 1*, 313 F.Supp. 90 (D.Colo.1970) (*Keyes V*), *aff'd in part and rev'd in part*, 445 F.2d 990 (10th Cir.1971) (*Keyes VI*), *cert. granted* 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972) and *cert. denied sub. nom School Dist. No. 1 v. Keyes*, 413 U.S. 921, 93 S.Ct. 3033, 37 L.Ed.2d 1043 (1973), *modified and remanded*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed. 548 (1973) (*Keyes VII*), *on remand*, 368 F.Supp. 207 (D.Colo.1973) (*Keyes VIII*) and 380 F.Supp. 673 (D.Colo.1974) (*Keyes IX*), *aff'd in part and rev'd in part*, 521 F.2d 465 (10th Cir.1975) (*Keyes X*), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976); *Keyes v. School Dist. No. 1*, 474 F.Supp. 1265 (D.Colo. 1979) (*Keyes XI*); *Keyes v. School Dist. No. 1*, 540 F.Supp. 399 (D.Colo.1982) (*Keyes XII*); *Keyes v. School Dist. No. 1*, 576 F.Supp. 1503 (D.Colo.1983) (*Keyes XIII*); *Keyes v. School Dist. No. 1*, 609 F.Supp. 1491 (D.Colo.1985) (*Keyes XIV*); I R. Tab 29, *Keyes v. School Dist. No. 1*, No. C–1499 (D.Colo. Oct. 29, 1985) (*Keyes XV*) (Order for Further Proceedings); *Keyes v. School Dist. No. 1*, 653 F.Supp. 1536 (D.Colo. 1987) (*Keyes XVI*); *Keyes v. School Dist. No. 1*, 670 F.Supp. 1513 (D.Colo.1987) (*Keyes XVII*).

district moved for an order declaring the Denver schools unitary, dissolving the injunction as it related to student assignments, and terminating the court's jurisdiction in the case. Plaintiffs opposed the motion and moved for an order directing the school district to prepare and submit numerous plans and policies to remedy what they considered shortcomings in the district's desegregation efforts. The court held a full hearing on the motions and later filed an opinion denying the district's motion, but refusing to rule on plaintiffs' motion pending further negotiations between the parties. *Keyes XIV*, 609 F.Supp. at 1521–22.

In its opinion, the court rejected the district's argument, *id.* at 1498, that compliance for an extended period of time with the 1974 court-approved desegregation plan, as modified in 1976, entitled the district to a declaration of unitariness. The court reasoned that the district's argument hinged on the thesis that the "1974 Final Judgment and Decree, as modified in 1976, was a complete remedy for all of the constitutional violations found in this case." *Id.* However, the court had indicated at the time of its 1976 order that further remedial changes would be necessary in the future. *Id.* at 1500.

The court supported its factual finding that the district was not unitary by placing weight on the following factors: its recognition in 1979 and the school board's recognition in 1980 that the district was not yet unitary, *id.* at 1501; the board's uncooperative attitude in recent years, *id.* at 1505; the board's recognition in one of its resolutions that compliance with the court-approved plan was insufficient, in itself, to desegregate the district's schools, *id.* at 1506; the increasing resegregation at three schools, *id.* at 1507; the district's misinterpretation of the faculty/staff assignment policy so that the fewest number of minority teachers would be placed in previously predominantly Anglo schools, *id.* at 1509–12; and the district's "hardship transfer" policy, which the court found was implemented with "a lack of concern about the possibility of misuse and a lack of monitoring of the effects of the policy," *id.* at

1514. In addition, the court believed that the district had not given adequate assurances that resegregation would not occur if the court terminated jurisdiction, *id.* at 1515, and that in any event, even if the board affirmatively tried to prevent resegregation, it would be compelled to comply with Colo. Const. Art. IX § 8 which outlaws "forced busing," compliance with which certainly would cause drastic resegregation of Denver's schools. *Keyes XIV*, 609 F.Supp. at 1515. Finally, the court noted that mere statistics indicating general integration in student assignments were insufficient to compel a finding of unitariness, *id.* at 1516, and indicated that the board had neither the understanding of the law nor the will to contravene community sentiment against busing that would be necessary for the district to achieve and maintain a unitary school system. *Id.* at 1519, 1520.

Following this ruling and the parties' failure to negotiate a settlement of their differences, the court ordered the school district to prepare and submit a plan "for achieving unitary status ... and to provide reasonable assurance that future Board policies and practices will not cause resegregation." *Keyes XV*, I R. Tab 29 at 2. Specifically, the court ordered the board to address four problem areas: (1) three elementary schools, Barrett, Harrington, and Mitchell, that were racially identifiable as minority schools; (2) the district's hardship transfer policy; (3) the assignment of faculty; and (4) plans to implement board Resolution 2233, which states the board's commitment to operation of a unitary school system. *Id.* at 2–3. It is from this order and the court's ruling in *Keyes XIV* that the school district appeals in case number 85–2814.

In February 1987, the district court noted that the board had responded positively to its order in *Keyes XV*, but that the plaintiffs still had ample reason for their concerns about the district's ability or willingness to achieve and maintain a unitary system. *Keyes XVI*, 653 F.Supp. at 1539–40. Nevertheless, the court cited the community's interest in controlling its school

district and decided "that it is time to relax the degree of court control over the Denver Public Schools." *Id.* at 1540. At the same time, the court concluded that a permanent injunction should be constructed, in part because one board's resolutions could not bind a subsequent board, and the constitutional duty was to *maintain*, not simply achieve, a desegregated, unitary school system. *Id.* at 1541–42.

Later in 1987, the district court issued an "interim decree" that eliminated reporting requirements and allowed the school district to make changes in the desegregation plan without prior court approval. *Keyes XVII*, 670 F.Supp. at 1515. The court attempted to fashion an injunction sufficiently specific to meet the requirements of Fed.R.Civ.P. 65(d), while at the same time allowing the board to operate "under general remedial standards, rather than specific judicial directives." *Id.* The court summarized its order as enjoining "governmental action which results in racially identifiable schools," *id.* at 1516, and said its decree was a step towards a final decree that would terminate the court's supervisory jurisdiction and the litigation's remedial phase. *Id.* In case number 87–2634, the district appeals the court's February 1987 order and its later "interim decree."

## II

■ Plaintiffs assert, as an initial matter, that this court does not have jurisdiction over case number 85–2814. Specifically, plaintiffs argue that subsequent orders of the district court have superseded *Keyes XIV*, and thus any appeal from the decision is moot. In the alternative, they contend that the court's "refusal to issue a declaratory judgment that a defendant has complied with an injunction," *see* Joint Brief of Appellees at 1, is not an appealable injunctive order under 28 U.S.C. § 1292(a)(1), the school district's asserted basis for appellate jurisdiction. In addition, plaintiffs argue that the appeal from *Keyes XV*, the court's order for the district to submit certain desegregation plans, also is mooted by the interim decree and was not an injunctive order under 28 U.S.C. § 1292(a)(1).

We hold that the school district's appeal from *Keyes XIV* is not moot and that we have jurisdiction to consider the appeal. A case becomes moot when the controversy between the parties no longer is "live" or when the parties have no cognizable interest in the appeal's outcome. *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam); *Wiley v. NCAA*, 612 F.2d 473, 475 (10th Cir.1979) (en banc), *cert. denied*, 446 U.S. 943, 100 S.Ct. 2168, 64 L.Ed.2d 798 (1980). Here, however, a decision favorable to the school district, reversing the district court's ruling that the school system was not unitary, or even remanding the question for further consideration, would give the district some relief from the court's order. The court's later orders do not supersede *Keyes XIV*, but rather emanate from and supplement that opinion's ruling that the school district is not unitary. *Cf. Battle v. Anderson*, 708 F.2d 1523, 1527 (10th Cir. 1983), *cert. dismissed sub. nom. Meachum v. Battle*, 465 U.S. 1014, 104 S.Ct. 1019, 79 L.Ed.2d 248 (1984). The appeal from *Keyes XIV* is not moot.

■ In addition, we have jurisdiction over the appeal from *Keyes XIV* because the denial of the district's motion for a declaration of unitariness constitutes an interlocutory order "continuing" an injunction. *See* 28 U.S.C. § 1292(a)(1). We agree with plaintiffs that denial of the district's motion did not "modify" any prior injunctive order of the court, but the court's order plainly resulted in a continuation of the injunctive decree mandating desegregation of the Denver schools. Because we reject plaintiffs' characterization of the court's order as a "refusal to issue a declaratory judgment," we need not address whether the district has made a sufficient showing to appeal the denial of an injunctive order. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 379, 107 S.Ct. 1177, 1183, 94 L.Ed.2d 389 (1987).

■ We hold, however, that the appeal from *Keyes XV* is moot. That order merely required the district to submit certain plans to the court, and the district fully complied long ago. Because the district

has no legal interest in our disposition of the appeal from that order, and because no decision by this court could grant the district any effectual relief from the order, *Keyes XV* is moot and the appeal from it dismissed. *See International Union, UAW v. Telex Computer Prods., Inc.,* 816 F.2d 519, 522 (10th Cir.1987); *Garcia v. Lawn,* 805 F.2d 1400, 1403 (9th Cir.1986). The other part of the appeal in case number 87–2634, dealing with *Keyes XVII*'s "interim decree," is properly before us, of course, as it modified the court's earlier injunction. 28 U.S.C. § 1292(a)(1).

## III

The school district's contentions in No. 85–2814 can be summarized as follows: (1) because the district's long-term compliance with the 1974 decree, as subsequently modified, has remedied any constitutional violation, the court now must terminate its jurisdiction over student assignments; (2) the district court's findings, which are not challenged on appeal, that the school system is not unitary regarding faculty assignments and hardship transfer policy, do not prevent student assignments from being unitary; (3) because there is no constitutional right to any particular racial balance in a school's student body, the district court erred in focusing on the racial identity of three elementary schools and in demanding future maintenance of racial balance; (4) concerns about the present or future segregative effects of board actions (especially implementation of a neighborhood school policy) are irrelevant to a determination of unitariness because discriminatory impact does not violate the Constitution nor does it justify the court's continued jurisdiction; and (5) there is no evidence that this or future boards will act with segregative intent. The United States, as amicus curiae, generally agrees with the district, and argues that a court must terminate jurisdiction when it finds the district to be unitary, a finding it must make when the district has in good faith fully implemented a court-approved desegregation plan.

## A

We begin at the beginning, with the proposition announced in *Brown v. Board of Education,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) (*Brown I*), that a state violates the Equal Protection Clause of the Fourteenth Amendment when it intentionally segregates or tolerates the segregation of public school students on the basis of race. Where no statutory dual system ever existed, such as in Denver, a plaintiff proves a violation of the Fourteenth Amendment by showing the existence of segregated schools and the maintenance of that segregation by intentional state action. *Keyes VII,* 413 U.S. at 198, 93 S.Ct. at 2692. The school district does not remedy these violations by simply halting its intentionally discriminatory acts and adopting racially neutral attendance policies. Rather, as the Supreme Court later held, the affirmative constitutional duty to desegregate expressed in *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*), requires school boards to *dismantle* their dual school systems. *Green v. County School Bd. of New Kent County,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968); *Swann v. Charlotte–Mecklenburg Bd. of Education,* 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971); *see also Keyes VII,* 413 U.S. at 222–23, 93 S.Ct. at 2704–05 (Powell, J., concurring and dissenting). The Supreme Court has noted that the primary duty to desegregate and eliminate racial discrimination in public education rests with the local school boards. *Brown II,* 349 U.S. at 299, 75 S.Ct. at 755. In fact, the school board has an affirmative duty under the Constitution to remedy past de jure discrimination and eliminate its effects, and "[e]ach instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Bd. of Education v. Penick,* 443 U.S. 449, 459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666 (1979). It is irrelevant that the school district does not intend to perpetuate the prior intentional segregation because "the measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a

school system is the effectiveness, not the purpose, of actions in decreasing or increasing the segregation caused by the dual system." *Dayton Bd. of Education v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (*Dayton II*).

When the school district defaults on its obligation to stop segregative acts and remedy their effects, a federal court in a properly-instituted case must order a remedy, and in so doing it may employ its full powers as a court of equity. *Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 2751, 53 L.Ed.2d 745 (1977) (*Milliken II*); *Swann*, 402 U.S. at 15, 91 S.Ct. at 1275. The court's remedial authority, however, is not plenary but extends only to the breadth of the violation proven. *Milliken II*, 433 U.S. at 282, 97 S.Ct. at 2758. A valid desegregation remedy must meet three requirements: (1) it must be tailored to the nature and scope of the constitutional violation; (2) it must be designed to restore the discrimination victims to the position they would have occupied had the discrimination not occurred; and (3) it must take into account the interest of state and local authorities in themselves managing the public schools. *Id.* at 280–81, 97 S.Ct. at 2757–58. But, within these parameters, a district court may order remedial programs even in areas in which intentional discrimination has not existed, if it concludes that the remedy is necessary to "treat the *condition* that offends the Constitution," and that "the constitutional violation caused the condition for which remedial programs are mandated." *Id.* at 282, 286 n. 17 & 287, 97 S.Ct. at 2758, 2760 n. 17 & 2760 (emphasis added); *Keyes VII*, 413 U.S. at 205, 93 S.Ct. at 2696 (defining de jure segregation as "a current *condition* of segregation resulting from intentional state action") (emphasis added).

Because desegregation remedial orders are equitable in nature, we review them only for abuses of discretion. *Wright v. Council of Emporia*, 407 U.S. 451, 470–71, 92 S.Ct. 2196, 2207–08, 33 L.Ed.2d 51 (1972); *Diaz v. San Jose Unified School Dist.*, 861 F.2d 591, 595 (9th Cir.1988). Thus, so long as a remedy is tailored to the violation, it need not be the least restrictive of the available options. *Swann*, 402 U.S. at 31, 91 S.Ct. at 1283 (appellate court will not overturn remedy if it is "reasonable, feasible and workable"); *United States v. Yonkers Bd. of Education*, 837 F.2d 1181, 1236 (2d Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); *see also United States v. Paradise*, 480 U.S. 149, 184, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (plurality opinion). Of course, the court may modify even a final decree if changing circumstances indicate the need for a modification. *Pasadena City Bd. of Education v. Spangler*, 427 U.S. 424, 437, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976); *Dowell ex rel. Dowell v. Board of Education of Oklahoma City Pub. Schools*, 795 F.2d 1516, 1520–21 (10th Cir.) (*Dowell I*), *cert. denied*, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).

Once a school district has eliminated all intentional racial discrimination, and eradicated all effects of such discrimination, the court may declare it unitary. *Green*, 391 U.S. at 439–40, 88 S.Ct. at 1694–95; *Brown II*, 349 U.S. at 301, 75 S.Ct. at 756. Although the Supreme Court has not defined precisely what facts or factors make a district unitary, a starting point is to evaluate the factors that make a system segregated. In the context of a unitariness decision, these factors include elimination of invidious discrimination in transportation of students, integration of faculty and staff, equality of financial support given to extracurricular activities at different schools and integration of those activities, nondiscriminatory construction and location of new schools, and assignment of students so that no school is considered a white or black school. *E.g., Swann*, 402 U.S. at 18–19, 91 S.Ct. at 1277–1278; *United States v. Montgomery County Bd. of Education*, 395 U.S. 225, 231–32, 89 S.Ct. 1670, 1673–74, 23 L.Ed.2d 263 (1969). This court has defined "unitary" as the elimination of invidious discrimination and the performance of every reasonable effort to eliminate the various effects of

past discrimination. *Dowell ex rel. Dowell v. Board of Education, Oklahoma City Pub. Schools,* 890 F.2d 1483, 1491 & n. 15 (10th Cir.1989) (*Dowell II*); *Brown v. Board of Education,* 892 F.2d 851, 859 (10th Cir.1989). In so defining "unitariness," we recognize that racial balance in the schools is no more the goal to be attained than is racial imbalance the evil to be remedied. *See Spangler,* 427 U.S. at 434, 96 S.Ct. at 2703; *Swann,* 402 U.S. at 24, 91 S.Ct. at 1280. Therefore, a court is without power to order constant adjustments in the assignment of students, merely to maintain a certain racial balance. *Spangler,* 427 U.S. at 436–37, 96 S.Ct. at 2704–05. But, we also recognize that when a school board has a duty to liquidate a dual system, its conduct is measured by "the effectiveness, not the purpose, of [its] actions in decreasing or increasing segregation caused by the dual system." *Dayton II,* 443 U.S. at 538, 99 S.Ct. at 2979. The existence of racially identifiable schools is strong evidence that the effects of de jure segregation have not been eliminated. *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281.

■■■■■ Long-term compliance with a desegregation plan that is complete by its own design and does not contemplate later judicial reappraisal entitles the school district to a declaration of unitariness. *Spangler,* 427 U.S. at 435–37, 96 S.Ct. at 2704–05; *see Spangler v. Pasadena City Bd. of Education,* 611 F.2d 1239, 1243, 1244 (9th Cir.1979) (Kennedy, J., concurring) (because desegregation plan was "a full and complete remedy," compliance with plan for nine years, in light of nature and degree of violation, sufficient to make district unitary). Whether the plan was in fact a complete remedy for the violation requires both an examination of the original violation, and, as the district court noted here, an examination of the actual effects of the plan. *Keyes XIV,* 609 F.Supp. at 1506; *cf. Dayton II,* 443 U.S. at 538, 99 S.Ct. at 2979. Thus, compliance with even a court-approved desegregation plan, by itself and without proof of the executed plan's intention and effect, does not make a district unitary. *Pitts v. Freeman,* 755 F.2d 1423,

1426 (11th Cir.1985); *United States v. Texas Educ. Agency,* 647 F.2d 504, 508 (5th Cir. Unit A 1981). Of course, while a district is not unitary, the court must maintain supervisory jurisdiction and may require prior approval of various board actions. *Swann,* 402 U.S. at 30, 91 S.Ct. at 1283; *Brown II,* 349 U.S. at 301, 75 S.Ct. at 756 (during transition to unitary system, court *will* retain jurisdiction). During this "pre-unitariness" period the board bears a " 'heavy burden' of showing that actions that increased or continued the effects of the dual system serve important and legitimate ends." *Dayton II,* 443 U.S. at 538, 99 S.Ct. at 2979 (citation omitted).

### B

■■■■ The district court's finding that the school district had not achieved unitary status is a factual one which we review under a clearly erroneous standard. *Brown,* 892 F.2d at 858; *see also id.,* at 854, 874 (Baldock, J., dissenting). Applying the principles discussed above and this standard, we cannot conclude that the district court was clearly erroneous in holding that the school district's pupil assignment policies were nonunitary.

As an initial matter, we agree with the school district that it may be declared unitary in certain aspects, even though other aspects remain "nonunitary." *See, e.g., Spangler,* 427 U.S. at 436–37, 96 S.Ct. at 2704–05; *id.* at 442, 96 S.Ct. at 2707 (Marshall, J., dissenting); *Morgan v. Nucci,* 831 F.2d 313, 318 (1st Cir.1987). Just as a remedy must be tailored to fit the scope of the violation, *Milliken II,* 433 U.S. at 280–81, 282, 97 S.Ct. at 2757–58, 2758; *Dayton I,* 433 U.S. at 420, 97 S.Ct. at 2775, so must the court relinquish supervisory control over a school district's attendance policies and decisions when the need for that close supervision no longer exists. *See Jackson County,* 794 F.2d at 1543 ("continuing involvement," though not necessarily permanent injunction, must terminate when no more constitutional violations exist to justify continuing supervision). But even so, the district makes virtually no argument here that the district court was clearly er-

roneous in rejecting the district's evidence and concluding that the district had failed to prove that existing resegregation resulted from demographic changes and not from actions of the board. *See Keyes XIV,* 609 F.Supp. at 1507–08. Our independent review of the record reveals nothing that would compel us to overturn the court's refusal to find convincing the district's evidence. Before the declaration of unitariness it is the district's burden to prove resegregation has resulted from demographic changes and not from actions of the board. *See Dayton II,* 443 U.S. at 538, 99 S.Ct. at 2979.

Instead of arguing that the district court was wrong on the facts, the district argues that the court was wrong on the law. In one respect, we agree. As noted above, a district may be declared unitary in some respects and not others. The district court appears to have held to the contrary, *see Keyes XIV,* 609 F.Supp. at 1508, 1517, and if that was its intention, it erred. But the error is harmless because the record evidence adequately supports the court's specific finding that *student assignments* are nonunitary.[2]

▄▄▄ We reject the district's other argument which, in essence, is that as a matter of law three racially identifiable elementary schools out of about eighty cannot prevent a school district from attaining unitary status.[3] A few racially identifiable schools do not, as a matter of course, prevent a district from being unitary. *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281. Yet, the existence of such schools, especially when they once have been eliminated and then resurface as a result of board action, is strong evidence that segregation and its

effects have not been eradicated. *See Columbus Bd. of Education v. Penick,* 443 U.S. 449, 460–61, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979). Even if only a few of many schools are racially identifiable, the district has the burden of showing that such schools are nondiscriminatory and that their composition is not the result of present or past discrimination.[4] *Dayton II,* 443 U.S. at 538, 99 S.Ct. at 2979; *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281. The district court found that the district had not met its burden. The district argues that all it had to prove was that the resegregation was not the result of new, intentional segregation. As explained above, this proof is insufficient.

The district court believed that the district was both without the ability and without the will to ensure that the effects of prior segregation did not resurface. *Keyes XVII,* 670 F.Supp. at 1515; *Keyes XVI,* 653 F.Supp. at 1540; *Keyes XIV,* 609 F.Supp. at 1515, 1520. We consider this a fact-finding of the district court to which we must give deference. *See Penick,* 443 U.S. at 470, 99 S.Ct. at 2983 (Stewart, J., concurring in judgment). Thus, we must uphold the district court's order retaining supervisory jurisdiction over the Denver public schools.

## IV

We turn now to No. 87–2634, the district's appeal of the district court's "interim decree" set out in *Keyes XVII,* 670 F.Supp. at 1516–17. That modification of the court's prior injunction was intended to relax the court's control and allow the school district to make changes without prior ap-

---

**2.** The district court viewed the 1974 desegregation plan, as modified in 1976, as one that was not intended to be complete in itself; rather, the court and the district had "the expectation that changes would be required in future years." *Keyes XIV,* 609 F.Supp. at 1506. That is also our reading of the record and the history of the litigation. Thus, in this respect this case is unlike *Spangler,* which the district relies upon so heavily. *See Spangler,* 611 F.2d at 1243.

**3.** The district does not here dispute the standard employed by the district court in determining whether a school is "racially identifiable."

**4.** That the number of racially identifiable schools here—three out of about eighty elementary schools—is a smaller percentage than that found to be constitutionally acceptable in *Spangler,* where five of thirty-two schools were racially identifiable, is only marginally relevant. The unitariness determination was and is a fact-bound decision, and when unitariness is achieved will differ with each different school district.

proval. *Id.* at 1515. The interim decree attempted to strike a balance between allowing the district to regain control of student assignments while also ensuring that the board would not adopt a student attendance policy discriminatory in practice and impact. *See Penick,* 443 U.S. at 464, 465 n. 13, 99 S.Ct. at 2950, 2950 n. 13 (irrelevant that present acts have little incremental segregative impact if they, in combination with previous segregative acts, have natural and foreseeable consequence of disparate impact on minorities).

▮ Some of the complaints about the interim decree relate to the district's contention that we should override the district court's finding of nonunitariness, at least as to pupil assignment. But the district also asserts that the interim injunction is indefinite, vague, and in violation of Fed.R. Civ.P. 65(d). That rule requires that an injunction be reasonably specific in identifying what acts are prohibited or re-

quired, both to give notice to the defendant of what is prohibited, and to guide an appellate court in reviewing the defendant's compliance or noncompliance with the injunction. *Schmidt v. Lessard,* 414 U.S. 473, 476–77, 94 S.Ct. 713, 715–16, 38 L.Ed.2d 661 (1974); *Daniels v. Woodbury County,* 742 F.2d 1128, 1134 (8th Cir.1984). An injunction "too vague to be understood" violates the rule, *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967), and, generally, injunctions simply requiring the defendant to obey the law are too vague. *E.g., City of Mishawaka v. American Elec. Power Co.,* 616 F.2d 976, 991 & n. 18 (7th Cir. 1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

▮ Paragraph 4 of the interim decree does no more than require the district to obey the law, and therefore must be stricken.[5] *Payne v. Travenol Labs., Inc.,*

5. The interim decree, in its entirety, states:
ORDERED AND ADJUDGED:
1. The defendants, their agents, officers, employees and successors and all those in active concert and participation with them, are permanently enjoined from discriminating on the basis of race, color or ethnicity in the operation of the school system. They shall continue to take action necessary to disestablish all school segregation, eliminate the effects of the former dual system and prevent resegregation.
2. The defendants are enjoined from operating schools or programs which are racially identifiable as a result of their actions. The Board is not required to maintain the current student assignment plan of attendance zones, pairings, magnet schools or programs, satellite zones and grade-level structures. Before making any changes, the Board must consider specific data showing the effect of such changes on the projected racial/ethnic composition of the student enrollment in any school affected by the proposed change. The Board must act to assure that such changes will not serve to reestablish a dual school system.
3. The constraints in paragraph 2 are applicable to future school construction and abandonment.
4. The duty imposed by the law and by this interim decree is the desegregation of schools and the maintenance of that condition. The defendants are directed to use their expertise and resources to comply with the constitutional requirement of equal education opportunity for all who are entitled to the

benefits of public education in Denver, Colorado.
5. The District retains the authority to initiate transfers for administrative reasons, including special education, bilingual education and programs to enhance voluntary integration. The defendants shall maintain an established policy to prevent the frustration, hindrance or avoidance of a District student assignment plan through parent initiated transfers and shall use administrative procedures to investigate, validate and authorize transfer requests using criteria established by the Board. If transfers are sought on grounds of 'hardship', race, color or ethnicity will not be a valid basis upon which to demonstrate 'hardship'. The defendants shall keep records of all transfers, the reasons therefor, the race, color or ethnicity of the student, and of the effects on the population of the transferee and transferor schools.
6. No student shall be segregated or discriminated against on account of race, color or ethnicity in any service, facility, activity, or program (including extracurricular activities) conducted or sponsored by the school in which he or she is enrolled. All school use or school-sponsored use of athletic fields, meeting rooms, and all other school related services, facilities and activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race, color or ethnicity. The District shall provide its resources, services and facilities in an equitable, nondiscriminatory manner.

565 F.2d 895, 897–98, 900 (5th Cir.), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978). The same would be true of paragraphs 1 and 7, except that such provisions must be understood as continuing in effect the prior injunction which placed upon the district a continuing duty to disestablish a formerly dual system. Given the court's finding that unitariness has not yet been achieved, even in pupil assignments, such continuing prohibitions, though stated in general terms, are not objectionable. We construe the statement of the district's duties to take action to disestablish and eliminate the effects of past racial segregation as an order that will terminate once the district is declared unitary, *see Swann,* 402 U.S. at 32, 91 S.Ct. at 1284. It would be better to say so explicitly, but we do not require that statement be placed into what is specifically designated an "interim" decree.

The prohibition on enforcement of Colorado's anti-busing constitutional provision, in paragraph 8, may be unnecessary, but given the district's admission that the anti-busing amendment is unconstitutional it cannot complain. Further, this prohibition gives the district legal authority to disregard the Colorado provision. *See Swann,* 402 U.S. at 45, 91 S.Ct. at 1285.

Paragraphs 2, 9(A), and 9(C) should not be interpreted to require that racial balance in any school or department necessarily reflect the racial proportions in the district as a whole, as there is no constitutional right to any particular level of integration. *Spangler,* 427 U.S. at 436–37, 96 S.Ct. at 2704–05. On remand, the district court should make this clear.

Other than those discussed above, we have no objection to the district court's decree. It is a commendable attempt to give the board more freedom to act within the confines of the law. We recognize the difficulty in drafting an injunction that will allow the district maximum latitude in formulating policies, while at the same time making the injunction sufficiently specific. The degree of specificity necessary may be determined in light of the difficult subject matter. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 669 (8th Cir.1987); *Common Cause v. NRC,* 674 F.2d 921, 927 (D.C.Cir.1982). Should contempt proceedings ever be necessary, of course, any ambiguity in the injunction will inhere to the district's benefit. *See Ford v. Kammerer,* 450 F.2d 279, 280 (3d Cir.1971); *see also United States v. Holtzman,* 762 F.2d 720, 726 (9th Cir.1985) (injunctions not to be set aside unless "so vague that they have no reasonably specific meaning," but

---

7. The defendants shall maintain programs and policies designed to identify and remedy the effects of past racial segregation.

8. The defendants shall provide the transportation services necessary to satisfy the requirements of this interim decree notwithstanding the provisions of Article IX, Section 8 of the Colorado Constitution.

9(A). The principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial or ethnic composition of a staff indicate that a school is intended for minority students or anglo students.

(B). Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color or ethnicity.

(C). Defendants are required to use an effective affirmative action plan for the hiring of minority teachers, staff and administrators with the goal of attaining a proportion which is consistent with the available labor force; the plan shall contain yearly timetables and a reasonable target date for the attainment of the affirmative action goals.

10. The District will continue to implement the provisions of the program for limited English proficiency students heretofore approved by the Court in the Language Rights Consent Decree of August 17, 1984. Nothing in this interim decree shall modify or affect the Language Rights Consent Decree of August 17, 1984, and the prior orders entered in this case relating thereto shall remain in full force and effect.

11. It is further provided that this interim decree is binding upon the defendant Superintendent of Schools, the defendant School Board, its members, agents, servants, employees, present and future, and upon those persons in active concert or participation with them who receive actual notice of this interim decree by personal service or otherwise.

12. This interim decree, except as provided herein, shall supersede all prior injunctive orders and shall control these proceedings until the entry of a final permanent injunction."

*Keyes XVII,* 670 F.Supp. at 1516–17.

"all ambiguities or inconsistencies are resolved in favor of the person subject to the injunction").

We understand the school district's struggle to be free from judicial supervision and control. We also recognize the district's frustration with not knowing its precise obligations under the Constitution. At the same time, it is the district court's duty, and ours, to enforce the Constitution and protect the rights it grants, including the right of each public school student to attend a school where intentional segregation is banished and its effects remedied. We recognize that the showings required to obtain unitariness are difficult to make. But when the district makes those showings is entirely within its own control. Although the desegregation "vehicle can carry only a limited amount of baggage," *Swann*, 402 U.S. at 22, 91 S.Ct. at 1279, in Denver the district has not accomplished all desegregation possible and practical.

The cause is remanded for the reconsideration of language changes in the interim decree, as set out in this opinion. In all other respects, it is AFFIRMED.