Mark BRINKMAN, et al., Plaintiffs,

v.

John J. GILLIGAN, et al., Defendants.

No. C–3–75–304.

United States District Court,
S.D. Ohio,
Western Division.

June 17, 1999.

Michael Sussman, Sussman Bergstein Wotorson & Whateley, Goshen, NY, for Plaintiffs.

Roger Francis Carroll, James G. Tassie, Ohio Attorney General, Columbus, OH, Steven Routh, Hogan & Hartson, Washington, DC, Dwight Allan Washington, Dwight A. Washington Co LPA, Dayton, OH, Scott F. Sturges, Buckley King & Bluso, Columbus, OH, James Alan Dyer, Karl R. Ulrich, Sebaly, Shillito & Dyer, Dayton, OH, for Defendants.

DECISION AND ENTRY OVERRULING, FOR WANT OF JURISDICTION, DAYTON DEFENDANTS' MOTION TO SECURE ADDITIONAL RELIEF (DOC. # 274); DECISION AND ENTRY REJECTING JURISDICTIONAL CHALLENGE TO DAYTON DEFENDANTS' MOTION TO MODIFY STUDENT ASSIGNMENT PLAN (DOC. # 275); CONFERENCE CALL SET

RICE, Chief Judge.

On April 17, 1972,[1] the Plaintiffs, a group of school children, their parents and the NAACP, initiated this lawsuit, alleging that the public schools of the Dayton Public School System were segregated in violation of the Equal Protection Clause of the Fourteenth Amendment. The Plaintiffs named two groups of Defendants, to wit: 1) the Dayton Board of Education, six of its members and its superintendent ("Dayton Defendants"); and 2) the Governor of the state of Ohio, the state Attorney General, the Ohio State Board of Education, the Ohio Department of Education and the State Superintendent of Public

---

1. The careful reader may well wonder how a lawsuit, bearing a Case Number with a "75" prefix, indicating that the litigation was initiated in 1975, could have been filed in 1972. The simple explanation is that this case was initially filed in Columbus in 1972. When transferred to Dayton three years later, this litigation was assigned its present Case Number. *See* Doc. # 98.

Instruction ("State Defendants").[2] Although the Plaintiffs brought this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure (*see* Doc. # 1 at ¶ 3), there is no indication that this litigation has been certified as such, either at the Plaintiffs' request or otherwise.[3] After being dormant for more than ten years, this litigation was resuscitated in December, 1997, when the Dayton Defendants filed their Motion to Secure Additional Relief (Doc. # 274) and their Motion to Modify Student Assignment Plan (Doc. # 275). Thereafter, this Court entered Case Management Order No. 1, in which it directed the parties and the *amicus curiae* to address initially whether it has jurisdiction to entertain either of these motions and established a briefing schedule on that issue. *See* Doc. # 281. The parties have filed their memoranda, and the Court now turns to the issue of whether it has subject matter jurisdiction to reach the merits of either or both of those motions, beginning its analysis with a review of the path of this litigation through the federal courts.

Before proceeding with the above analysis, however, the Court must stress in the most emphatic of language, that, contrary to the popular belief in the community and in the media which informs that community, there is *not* presently pending before this Court a motion to end busing in the Dayton school system. Although the Dayton Defendants have filed a motion seeking to modify the school assignment system (*see* Doc. # 275), by dividing the school district into three zones, each of which would have a racial balance which is within 15%, plus or minus, of the racial balance of the system as a whole, with students assigned, at least at the elementary school level, to such a school located within the particular zone in which they reside, each such school having a racial balance of plus or minus 15% of the zone in which it is located, that motion most definitely is not a request to end busing and to declare that the Dayton school system is unitary.

Judge Carl B. Rubin, now deceased, oversaw this litigation from its inception through the entry of a Consent Judgment between the two groups of Defendants on December 9, 1987 (Doc. # 273).[4] That judicial officer decided to bifurcate the issues of liability presented by the Plaintiffs' Complaint (Doc. # 1), proceeding first with their claims against the Dayton Defendants and reserving their claims against the State Defendants for later resolution. *See* Doc. # 35. Thus, the initial trial of this litigation focused exclusively on the question of whether the actions of the Dayton Defendants had caused the Dayton Public Schools to be segregated, in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* (indicating that the initial trial would address only "whether the school system of Dayton [was] a segregated one by reason of the acts of the Dayton Board of Education").

On February 7, 1973, Judge Rubin issued his Decision, finding that the actions of the Dayton Defendants constituted cu-

---

2. According to the State Defendants, all of that group of Defendants, except the State Superintendent of Public Instruction, were dismissed during the course of this litigation. Thus, he is the only Defendant from that group listed on the caption of the memorandum they have filed. For convenience, the Court will employ the phrase "State Defendants" throughout this Decision; however, by doing so, it does not imply that any of that group, other than the State Superintendent of Public Instruction, remains a Defendant in this litigation.

3. On November 3, 1972, the Plaintiffs filed a memorandum in which they argued that both the individual Plaintiffs and the NAACP had standing to prosecute this litigation. *See* Doc. # 41. Therein, the Plaintiffs also stated that this litigation had been brought as a class action and argued that lawsuits, seeking to enjoin the existence of segregation in public schools, were routinely brought as class actions. If that memorandum was intended to serve as a motion to certify this litigation as such an action, that request was not ruled upon.

4. After December 9, 1987, this litigation was dormant until the Dayton Defendants filed the two motions in question.

mulative violations of the Equal Protection Clause of the Fourteenth Amendment. *See* Doc. # 59. On July 17, 1973, Judge Rubin entered an Order in which he adopted, with one minor alteration, the remedial plan proposed by the majority of the Dayton Board of Education. *See* Doc. # 66. The Plaintiffs and the Dayton Defendants both appealed to the Sixth Circuit Court of Appeals. That court affirmed Judge Rubin's finding that the Dayton Defendants were liable; however, it concluded that the remedy imposed by that judicial officer was "inadequate, considering the scope of the cumulative violations" and remanded the matter. *Brinkman v. Gilligan,* 503 F.2d 684, 704 (6th Cir.1974) (*"Brinkman I "*).[5]

On remand, Judge Rubin adopted a new remedial plan, which the Sixth Circuit once again rejected, because it failed to eliminate the basic pattern of one-race schools and the continuing effects of past segregation throughout the system. *Brinkman v. Gilligan,* 518 F.2d 853 (6th Cir.1975) (*"Brinkman II "*). Accordingly, the Sixth Circuit remanded the matter to Judge Rubin, directing him to adopt a system-wide plan for the 1976–77 school year. *Id.* at 857.

On December 29, 1975, and on March 23, 1976, Judge Rubin entered Orders (Docs. # 105 and # 121, respectively), under which every school in the Dayton system was required to have, by September 1,

1976, a racial balance which was within 15%, plus or minus, of the racial balance of the system as a whole. In his March 23rd Order, Judge Rubin wrote:

> No determination herein shall be deemed to bar the submission of any other plan that would be consistent with the standards set forth in the order of December 29, 1975. The Court will at all times entertain a motion by any party for consideration of any specific procedure and approval will be freely granted so long as the restrictions set forth above are adhered to.

Doc. # 121 at 3.[6] Upon appeal by the Dayton Defendants from those Orders, the Sixth Circuit affirmed. *Brinkman v. Gilligan,* 539 F.2d 1084 (6th Cir.1976) (*"Brinkman III "*). The Dayton Defendants then appealed to the United States Supreme Court, which reversed, concluding that the finding that the Dayton Defendants had engaged in cumulative violations was too ambiguous to support the district-wide remedy, "implicitly, if not explicitly, imposed by the [Sixth Circuit]." *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 421, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (*"Dayton I "*). Accordingly, the Supreme Court remanded for further proceedings, including an additional evidentiary hearing.[7]

After having conducted such a hearing, Judge Rubin, on December 15, 1977, is-

---

**5.** In his Order of July 17, 1973 (Doc. # 66), Judge Rubin had also questioned whether the Plaintiffs' claims against the State Defendants were moot. In *Brinkman I,* the Sixth Circuit ordered that the State Defendants be kept as parties, implying that there was significant evidence that they were also liable.

**6.** In his December 29, 1975, Order (Doc. # 105), Judge Rubin established certain guidelines, including the plus or minus 15% requirement, and appointed a Master to devise a desegregation plan in consultation with the parties. In his Report (Doc. # 117), the Master recommended a plan which would meet the 15%, plus or minus, requirement by redrawing some school attendance zones and pairing other schools. In his March 23, 1976,

Order (Doc. # 121), Judge Rubin addressed the Dayton Defendants' objections to the Master's Report, sustaining all but one. The net result of that Order was that Judge Rubin adopted the Master's Report, while affording the Dayton Defendants some flexibility in how to implement the 15%, plus or minus, requirement.

**7.** The Supreme Court noted that Judge Rubin's March 23, 1976, desegregation plan had been in effect during the 1976–77 school year and indicated that it could remain in effect for the 1977–78 school year. 433 U.S. at 421, 97 S.Ct. 2766. On August 12, 1977, Judge Rubin ordered that plan to remain in effect for the first semester of the 1977–78 school year. *See* Doc. # 157.

sued his Findings of Fact and Conclusions of Law, concluding that the Plaintiffs had failed to meet their burden of proof that the Dayton Defendants had operated a segregated school system in violation of the Equal Protection Clause, thus dismissing this litigation. *See* Doc. # 181. Upon the Plaintiffs' appeal, the Sixth Circuit reversed and directed Judge Rubin to reinstate his March 23, 1976, desegregation plan. *Brinkman v. Gilligan,* 583 F.2d 243 (6th Cir.1978) (*"Brinkman IV"*). Once again, the Dayton Defendants obtained review from the Supreme Court; however, on this occasion, the Supreme Court affirmed the decision of the Sixth Circuit. *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (*"Dayton II"*). Thus, with minor modifications,[8] the Dayton Public Schools have been operated under Judge Rubin's March 23, 1976 Order (Doc. # 121), since the beginning of the 1976–77 school year.

The Supreme Court's decision in *Dayton II* brought to a close the portion of this lawsuit addressing the liability of the Dayton Defendants and the remedy to be imposed as a result of their constitutional violations. However, the State Defendants' liability had yet to be resolved. After having conducted a hearing on that issue, Judge Rubin issued his Decision, on May 24, 1985, concluding that the State Defendants, with the exception of the State Board of Education and the Ohio Department of Education,[9] were jointly and severally liable with the Dayton Defendants for the illegal segregation that existed within the Dayton school system. *Brinkman v. Gilligan,* 610 F.Supp. 1288, 1297 (S.D.Ohio 1985). Judge Rubin based that conclusion on the finding that the State Defendants had an affirmative obli-

gation, under both federal and state law, to investigate segregation within the Dayton public school system, and to eliminate such condition by withholding state funding from that system. *Id.* Finding that the failure of the State Defendants to take those actions was a proximate cause of the constitutional deprivation suffered by the Plaintiffs, he ordered that the individual State Defendants, the Governor, Attorney General and Superintendent of Public Instruction, "share equally with the Dayton Board of Education all expenses incurred to date, as well as future costs as they are incurred, in remedying the unconstitutional racial segregation in the Dayton school system." *Id.* at 1297–98. It bears emphasis that, in his Decision, Judge Rubin did *not* address the issue of what remedy was necessary to desegregate the Dayton Public Schools; that decision had been reached some nine years before. Rather, the issue resolved therein was whether the State Defendants would be held liable for paying for a portion of that remedy. Judgment was entered on that Decision. *See* Doc. # 255. Thereafter, the Governor and the Attorney General moved, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, to alter or to amend that judgment, arguing that there was no evidence that they had been involved in the segregation of the Dayton Public Schools. *See* Doc. # 258. When that motion was not opposed, Judge Rubin, on February 28, 1986, granted same and vacated the judgment to the extent it imposed liability upon the Governor and the Attorney General. *See* Doc. # 260. The Judge also commented that his ruling on that motion disposed of the last remaining issue in this litigation and directed the Clerk of Courts to note

---

8. On two occasions in 1976, Judge Rubin, at the request of the Dayton Defendants, approved modifications to the desegregation plan he had adopted on March 23, 1976. *See* Docs. # 133 and # 142. Until December, 1997, when the Dayton Defendants filed their Motion to Modify Student Assignment Plan (Doc. # 275), other modifications had neither been sought nor ordered.

9. Judge Rubin concluded that the Eleventh Amendment barred the Plaintiffs' claims against those two institutional Defendants. *Brinkman v. Gilligan,* 610 F.Supp. 1288, 1289–91 (S.D.Ohio 1985).

this case as "closed." *Id.* Both the Dayton Defendants and the Superintendent of Public Instruction, the only remaining State Defendant against whom liability had been imposed, appealed.

While those appeals were pending, these parties were able to reach a settlement, and, after the Sixth Circuit had granted their joint motion to remand, for the purpose of allowing that settlement to be approved by the Court in the form of a Consent Judgment, Judge Rubin entered such a Judgment (Doc. # 273) on December 9, 1987. In ¶ 1 of that Consent Judgment, the Superintendent of Public Instruction agreed, on behalf of Ohio, to pay the Dayton Defendants $25,146,834 for costs that had been incurred through June 30, 1986, in order to comply with Judge Rubin's March 23, 1976, desegregation order (Doc. # 121).[10] In ¶ 2 of that agreed judgment entry, the State Superintendent of Public Instruction, on behalf of Ohio, agreed to pay 50% of the transportation costs which would be incurred in the future to carry out that order, a period of time that was defined to begin on July 1, 1986. Transportation costs were defined as the purchase of new or used vehicles, vehicle operators' salaries and benefits, vehicle maintenance and repair, repair and replacement of vehicle storage and maintenance facilities, vehicle operating expenses such as fuel and oil, vehicle insurance, and other direct or indirect costs reasonably associated with transportation activities. Paragraph 3 provided that the payments under the two preceding paragraphs would be in addition to any other sum to which the Dayton Public Schools were otherwise entitled under state or federal law. In ¶ 4, Ohio gave the Dayton Defendants the discretion to devise and to employ appropriate programs to reduce racial isolation. However, that paragraph also obligated the Dayton Defendants to exercise good faith in devising and employing such programs and afforded Ohio the right to review them. Paragraph 5 provided:

The obligations arising from this Judgment Order shall not be affected in any manner by the continuation of or the existence of any past or future court order requiring desegregation or reduction of racial isolation. However, if a court of competent jurisdiction determines that the Dayton Board has failed in its obligations under any order issued by this Court in *Brinkman v. Gilligan,* case number 3–75–304, the financial obligations of the State under paragraph 2 herein, which obligations accrue after the date of issuance of any order by the court of competent jurisdiction, shall cease and shall be controlled solely by the entry of judgment of said court.

Doc. # 273 at 3–4. The Consent Judgment did not address the issue of what means would adopted to desegregate the Dayton Public Schools. That decision had been made almost 12 years previously. Moreover, under the Consent Judgment, the State Defendants were obligated to pay only for transportation costs. They were not obligated to pay for any other means of desegregating the Dayton school system. Finally, the Consent Judgment did not contain language, similar to that in the Order of February 28, 1986, indicating that this litigation was to be considered "closed."

That Consent Judgment was the last filing in this case, until the Dayton Defendants filed the two motions which bring this case before the Court. As a means of analysis, the Court will discuss the question of whether it has the jurisdiction to address the merits of these motions, in the order in which they were filed. Before engaging in that analysis, however, the Court will review the relief that the Dayton Defendants seek with the two motions.

With their Motion to Secure Additional Relief (Doc. # 274), the Dayton Defendants request that the Court require the State Defendants to pay for 50% of the expenses necessary to implement a pro-

---

**10.** Paragraph 1 also established a schedule by which the sum of $25,146,834 was to be paid.

posed Educational Reform Plan. The predicate for that motion is the Dayton Defendants' belief that operating under Judge Rubin's desegregation decree, for more than 20 years, has not succeeded in eliminating the last vestiges of segregation from the Dayton Public Schools. In particular, that group of Defendants asserts that one such vestige is the fact that many of the schools located in the areas in which African–American students resided were inferior and poorly maintained, which caused them to be closed in the 1970s and 1980s, without being rebuilt or replaced. This, according to the Dayton Defendants, places a burden on many African–American students to travel outside their neighborhoods to attend school. Another such vestige is "the lack of adequate staff and services in a number of areas, including school psychologists, social workers, guidance counselors, and personnel qualified to meet the needs of at-risk children, a disproportionate number of whom are African–American students." Doc. # 274 at 4. The Dayton Public Schools also lack adequate staff and technological support for students with particular educational needs, such as speech and auditory difficulties, "a disproportionate number of whom also are African–Americans." *Id.* The Dayton Defendants also cite the absence of district-wide, all-day kindergarten and pre-kindergarten programs, the lack of which they contend are vestiges of the dual system, because such programs were less important to the successful education of non-minority students whose educational needs were the focus of the dual system. In addition, the Dayton Defendants state that improvements are needed to eliminate cultural bias in the curriculum and that additional training is needed for the teachers employed within the Dayton Public Schools.

To eliminate those last vestiges of segregation from the Dayton Public Schools, the Dayton Defendants have proposed their Educational Reform Plan, which consists of an educational and a capital facilities component. At the elementary school level, the educational component would provide the opportunity for all students, ages three to five, to attend a high-quality, half-day preschool program; establish an all-day kindergarten for students entering the Dayton Public Schools as first-time kindergartners; reduce to 15:1, the ratio of pupils to teachers in kindergarten through grade three; retain a speech pathologist and install sound amplification systems and other appropriate technology in each kindergarten and first grade classroom to provide services for children who need assistance with speech development; and hire a media/technology specialist for each elementary school. At the secondary school level, the educational component of the Plan calls for the creation of a pilot program, under which students in grades 7–12 would attend school, in the same building, in an effort to facilitate the transition to high school and to give younger students access to advanced courses. In addition, curriculum coaches, with expertise in academic subject areas, would be assigned to each secondary school, in order to serve as on-site resources for curriculum development and instruction. The Plan would also establish an Alternative Intervention Secondary School, which would serve students who have been unable to succeed in traditional schools due to truancy, low academic achievement or other problems. The Plan also calls for the establishment of Multi-disciplinary Intervention Assistance Teams in each school, which would identify and address the educational, social and health problems that affect a student's ability to learn, and Family Resource Centers, which would assess and treat social, behavioral, emotional and substance abuse problems of students and their families. As part of the educational component, teachers and administrators would be provided at least 30 hours of training annually. The capital facilities component of the Plan would ensure that the Dayton Public School System has the modern facilities and equipment suited to the educational needs of its students and

that high-quality, desegregated educational facilities are available to all students on an equitable basis.

With their Motion to Modify Student Assignment Plan (Doc. # 275), the Dayton Defendants request that the Court modify the requirement, contained in Judge Rubin's desegregation decree, that each school within the Dayton school system have a racial balance which was within 15%, plus or minus, of the racial balance of the system as a whole.[11] According to the Dayton Defendants, the proposed plan would most significantly modify student assignment for elementary schools. *See* Doc. # 275 at 2. The school district would be divided into three zones, so that the percentage of African–American students in each zone would be within 15%, plus or minus, of the percentage of African–American students in the Dayton Public Schools as a whole. Students and their parents would be permitted to select any elementary school, located within the zone in which they reside. A student would be given his or her first choice, as long as space was available in the selected school and that school's racial balance was within 15%, plus or minus, of the racial composition of the elementary students living within that zone. Students would be assigned by a computerized lottery, with preference being given to students who live within the "walk area" of a particular school (1.5 miles for elementary students) and to those who have siblings who already attend that particular school. Secondary school students would be permitted to select any secondary school. Each student would be assigned to the school he or she had selected, as long as space was available and the racial balance of the school

was within 15%, plus or minus, of the district as a whole. As with elementary school students, preference would be given to students who live within the "walk area" of a particular school (2.0 miles for secondary school students) and to those students who have siblings who already attend a particular school. In addition, the modified Student Assignment Plan would include kindergarten students, who attend a full-day of school, among those who are counted for purposes of determining whether the Dayton Defendants are complying with their responsibilities under Judge Rubin's desegregation decree.[12]

## I. Jurisdictional Issue Pertinent to Both Motions

■ One of the State Defendants' arguments is equally applicable to both motions and, theoretically, could cause this Court to conclude that it is without jurisdiction to consider either. The State Defendants contend that this Court lacks such jurisdiction, because this litigation has been closed for more than a decade. As the State Defendants assert, Judge Rubin indicated in his February 28, 1986, Order (Doc. # 260) that this litigation was "closed." Nevertheless, this Court cannot agree with them that the use of that language prevents it from exercising jurisdiction over the Dayton Defendants' motions. As an initial matter, the February 28, 1986, Order was replaced by the Consent Judgment entered December 9, 1987. *See* Doc. # 273. That judgment does not indicate that this litigation is closed. Moreover, even if the February 28, 1986, Order had not been replaced by the Consent Judgment, this Court would not interpret the

---

11. In his Decisions of December 29, 1975 (Doc. # 105), and March 23, 1976 (Doc. # 121), Judge Rubin decreed that the ratio of African–American and white students (i.e., racial balance) in each school, within the Dayton school system, be within 15%, plus or minus, of the ratio of such students for the district as a whole. This Court uses the phrases "racial balance" and "percentage of African–American students" as synonyms.

12. In his Decisions of December 29, 1975 (Doc. # 105), and March 23, 1976 (Doc. # 121), Judge Rubin, did not address kindergartners. The Special Master, appointed by Judge Rubin, suggested that kindergartners attend the school within their attendance zone, or be assigned to another nearby school, at the discretion of the Dayton Board of Education. *See* Doc. # 117 at 13. No party objected to that recommendation.

statement that this litigation is "closed," as depriving it of jurisdiction. Judge Rubin did not indicate in his February 28th Order that he was relinquishing jurisdiction over this litigation or over his previously entered desegregation order (Doc. # 121). Indeed, the February 28th Order did not even address the desegregation decree. Thus, this Court interprets the use of the word "closed" as an administrative matter, a question of directing that a given case should not be counted on the Judge's docket, as it is no longer in active litigation, rather than as an indication that Judge Rubin was relinquishing jurisdiction over this case. Indeed, such an interpretation is in accordance with appellate court decisions, consistently holding that a District Court cannot relinquish jurisdiction over school desegregation litigation, until it has found that the school system has achieved unitary status. *See e.g., Keyes v. School District No. 1, Denver, Colorado,* 895 F.2d 659, 666 (10th Cir.1990), *cert. denied,* 498 U.S. 1082, 111 S.Ct. 951, 112 L.Ed.2d 1040 (1991); *Pitts v. Freeman,* 755 F.2d 1423, 1426 (11th Cir.1985). *See also, Youngblood v. Dalzell,* 925 F.2d 954 (6th Cir. 1991) (reversing decision of District Court to terminate consent decree, *sua sponte,* and without conducting a hearing on whether there had been compliance with its specific terms). Additionally, the Supreme Court has indicated that "federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *Board of Ed. of Oklahoma City v. Dowell,* 498 U.S. 237, 247, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

Given that federal supervision is intended to be temporary, a court must retain jurisdiction over a decree in order to be able to terminate that supervision, after the past discrimination has been remedied. The *Dowell* Court also recognized that compliance with a desegregation decree within a reasonable period of time can serve as the basis for its dissolution or modification. Moreover, it bears emphasis that Judge Rubin indicated in his Order of March 23, 1976, that he would "at all times entertain a motion by any party for consideration of any specific procedure." Simply stated, that language flatly contradicts the assertion by the State Defendants that Judge Rubin intended to relinquish jurisdiction over this case when he indicated that it was "closed." Accordingly, the fact that Judge Rubin may have directed, at one time, that this case be closed, for administrative purposes, does not, in and of itself, divest this Court of subject matter jurisdiction to consider the motions at issue.[13]

## II. Motion to Secure Additional Relief (Doc. # 274)

The predicate for this motion is the Dayton Defendants' belief that the desegregation plan adopted by Judge Rubin on March 23, 1976 (Doc. # 121), and ultimately affirmed by the Supreme Court in *Dayton II,* has not succeeded in eliminating, "root and branch,"[14] the last vestiges of the dual system (i.e., a school system in which students have been unconstitutionally segregated on the basis of race), which they had previously operated.[15] To remedy

---

**13.** In any event, even if Judge Rubin's Order were to be interpreted as a relinquishment of jurisdiction, the Dayton Defendants could file a motion, requesting that this Court reopen this litigation. Of course, whether this Court would have granted such a request (a question which is not necessary to resolve, since jurisdiction has not been relinquished) is a hypothetical question that need not be explored in this opinion.

**14.** In *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court held that local school

boards have a constitutional duty to eliminate the last vestiges of segregated school systems, "root and branch."

**15.** "Courts have used the terms 'dual' to denote a school system which has engaged in *intentional segregation of students by race,* and 'unitary' to describe a school system which has been brought into compliance with the command of the Constitution." *Board of Ed. of Oklahoma City v. Dowell,* 498 U.S. 237, 246, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

those alleged vestiges of segregation in the Dayton Public Schools, the Dayton Defendants have developed an Educational Reform Plan and request that this Court require the State Defendants to fund 50% of the cost of that Plan. The Plaintiffs have not, at this juncture, requested any form of additional relief from either the State Defendants or the Dayton Defendants. The Dayton Defendants argue that the State Defendants must contribute 50% of the costs of the Educational Reform Plan, because, in 1985, Judge Rubin ordered them to pay 50% of the costs of desegregating the Dayton Public Schools. The State Defendants argue that this Court does not possess subject matter jurisdiction to order them to pay that or any sum for purposes other than transportation. The State Defendants present a number of propositions in support of that argument, to wit: that this litigation no longer constitutes a live case or controversy; that the Dayton Defendants have not established the prerequisites for reopening this litigation, under either Rule 60(b) of the Federal Rules of Civil Procedure or *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); that the Eleventh Amendment bars this Court from entertaining the Motion to Secure Additional Relief (Doc. # 274); that the Dayton Defendants are judicially estopped from arguing that the Dayton school system remains a dual system; and that principles of federalism and comity dictate that this Court not become embroiled in what is essentially a dispute between the state of Ohio and one of its political subdivisions over the level of funding that Ohio will provide to its school districts. The Court will address those arguments in the above order.[16]

16. Above, the Court has addressed and has rejected the State Defendants' argument that it is without jurisdiction to entertain either motion filed by the Dayton Defendants, because Judge Rubin previously indicated that this litigation was "closed." As will be seen, it is not necessary that the Court address all of the State Defendants' arguments; however,

### A. Live Case or Controversy

Article III, Section 2, of the United States Constitution expressly limits the jurisdiction of federal courts to actual cases and controversies. The State Defendants argue that this litigation no longer constitutes a live case or controversy, because this litigation, although brought as a class action under Rule 23 of the Federal Rules of Civil Procedure, has never been certified as such. According to the State Defendants, all of the individual Plaintiffs have long since graduated from the Dayton Public Schools, which renders this litigation moot. In addition, the State Defendants argue that the Dayton Defendants do not have standing to assert claims on behalf of the Plaintiffs. The Court addresses these two contentions in the above order.

■ Addressing first the State Defendants' contention that a live controversy no longer exists, because this litigation has never been certified as a class action under Rule 23, this Court agrees with the State Defendants that the students, who were named as Plaintiffs when this litigation was initiated more than 27 years ago, have long since graduated or for other reasons ceased to be students in the Dayton Public Schools. Thus, if the only Plaintiffs in this litigation had been those students, this Court might agree with the State Defendants that the absence of an order certifying this litigation as a class action would prevent the *Plaintiffs*[17] from seeking additional relief. In *Board of School Commissioners of the City of Indianapolis v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), the Supreme Court addressed a somewhat analogous situation. Therein, the plaintiffs, a group of students,

the Court has elected to do so in order to establish a complete record.

17. It bears emphasis that it is the Dayton Defendants, rather than the Plaintiffs, who have requested additional relief from the State Defendants.

brought suit alleging that the rules governing the publication of a student newspaper violated their rights under the First Amendment. Although that lawsuit was brought as a class action, it had not been certified as such. Since the plaintiffs had graduated from school and the litigation had not been certified as a class action, the Supreme Court concluded that the case was moot, rather than presenting a live case or controversy. However, herein, the State Defendants overlook the fact that there are other Plaintiffs in this litigation, to wit: parents of students and the NAACP. Even if the Court were to assume that the parent/Plaintiffs no longer have children who attend the Dayton school system, rendering their claims moot, the NAACP does remain a Plaintiff in this litigation. Under certain circumstances, an organization, such as the NAACP, has standing to assert claims on behalf of its members. *See e.g., Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Since the NAACP has not requested additional relief, the Court does not need to decide whether that organization has representational standing.[18] Suffice to say, however, that

the presence of the NAACP, as a Plaintiff in this litigation, convinces this Court to reject the State Defendants' argument that the absence of an order certifying this lawsuit as a class action renders it moot and, therefore, subject to dismissal. This lawsuit is not moot.

■ Alternatively, the State Defendants argue that the Dayton Defendants do not have standing to assert the rights of the Plaintiffs in this litigation. Putting aside for a moment the fact that Plaintiffs herein seek no relief at this juncture (it is the Dayton Defendants, rather than the Plaintiffs, who have requested additional relief from the State Defendants), the Court does not agree that the Dayton Defendants are without standing. Even if the Court were to accept the State Defendants' assertion that a local board of education does not have standing to litigate the constitutional rights of its students,[19] that would not cause this Court to conclude that the Dayton Defendants are without standing in this matter. That group of Defendants has been under court ordered desegregation for more than 20 years. That obligation will remain in ef-

---

**18.** In *Hunt,* the Supreme Court established a three-part test that must be employed to determine whether an organization has standing to represent its members, to wit: 1) the members must have standing to sue in their own right; 2) the interests which the organization seeks to protect must be germane to its purpose; and 3) neither the claim asserted nor the relief requested must require the participation of the individual members in the lawsuit. With respect to the second prong, it cannot be questioned that, throughout at least the second half of this century, a central purpose of the NAACP has been the desegregation of public schools. Thus, a claim for additional relief by the NAACP, in this case, would be germane to its purpose. With respect to the third prong, the *Hunt* Court stressed that participation of an organization's members would not be required in a lawsuit in which the claims are properly resolved in a group, as opposed to an individual, context. 432 U.S. at 344, 97 S.Ct. 2434. Any claim for additional relief herein would be properly so resolved in a group context. Consequently, the only issue concerning the

representational or associational standing of the NAACP would be whether one of its members was a student or the parent of a student in the Dayton Public Schools. On November 3, 1972, the NAACP filed a memorandum arguing that it had standing as the representative of its members. *See* Doc. # 41. Therein, the NAACP asserted that many of its members had children in the Dayton Public Schools. Whether that remains true today is an issue which this Court need not presently decide.

**19.** In *Akron Board of Education v. State Board of Education,* 490 F.2d 1285 (6th Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974), the Sixth Circuit reached the opposite conclusion, holding that the Akron Board of Education ("Akron") had standing to bring a suit against the Ohio State Board of Education, alleging that a decision by the state board, transferring an area from Akron to another school district, violated the Fourteenth Amendment rights of the students who remained within Akron.

fect, until the Dayton school system has reached unitary status.[20] The Dayton Defendants fear that said status cannot be achieved unless the Educational Reform Plan is implemented, something which will require the financial participation of the State Defendants. Thus, while the relief sought by the Dayton Defendants will certainly flow to the students within the Dayton school system, the Dayton Defendants will also benefit from that relief, if it should permit them to become free of a court ordered desegregation decree. In other words, the Dayton Defendants have a personal stake in the resolution of their request for additional relief. *See Greater Cincinnati Coalition for the Homeless v. City of Cincinnati,* 56 F.3d 710, 715 (6th Cir.1995) ("In order to establish standing sufficient to satisfy the case or controversy requirement of Article III, a plaintiff in federal court must allege such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.") (Internal quotation marks and citations omitted). Accordingly, the Court concludes that the Dayton Defendants have standing in this lawsuit to prosecute its motion.

In sum, the Court concludes that the Dayton Defendants' Motion to Secure Additional Relief presents a live case or controversy.

## B. Rule 60(b) and Rufo

According to the State Defendants, their obligation to pay to desegregate the Dayton school system was capped by the 1987 Consent Judgment, under which they are only obligated to pay for 50% of the transportation costs to achieve that purpose. Thus, the State Defendants contend that the Dayton Defendants can obtain additional relief only if this Court were to reopen that Consent Judgment, and that the Consent Judgment cannot be reopened

under either Fed.R.Civ.P. 60(b) or *Rufo v. Inmates of Suffolk County Jail, supra.* The Dayton Defendants, on the other hand, argue that the State Defendants' obligation to pay for desegregation was established by Judge Rubin's decision of May 24, 1985, wherein he concluded that the State Defendants were jointly and severally liable for the segregation that existed in the Dayton Public Schools and must share equally in the expense of remedying that condition, by paying 50% of the costs incurred, both up to that date and in the future, to remedy the unconstitutional conditions that had been found to exist. *See* 610 F.Supp. at 1297–98. According to the Dayton Defendants, the obligation of the State Defendants to pay for 50% of future desegregation expenses, as established in Judge Rubin's 1985 decision, survived the entry of the Consent Judgment. Thus, the Dayton Defendants essentially contend that they are not requesting the Court to reopen the 1987 Consent Judgment; rather, they are merely requesting that the Court require the State Defendants to meet the liability imposed upon them by Judge Rubin in 1985. The Dayton Defendants' theory is that the Consent Judgment merely addressed the State Defendants' liability for future transportation costs, only one component of the universe of costs necessary to achieve a desegregated school system. As can be seen, the Court must first examine the relationship between Judge Rubin's 1985 decision and the 1987 Consent Judgment entered over two years later. In particular, the Court must decide whether the Consent Judgment superseded and replaced that aspect of the 1985 decision which obligated the State Defendants to pay for 50% of the costs incurred in the future to remedy the unconstitutional conditions in the Dayton Public Schools.

■ Given the procedural context under which the Consent Judgment was entered, as well as the text of that agreed order,

---

**20.** It bears emphasis that no party has ever filed a motion requesting that Judge Rubin or

any judicial officer find that the Dayton school system has achieved unitary status.

this Court is compelled to conclude that the Consent Judgment was meant to supersede and to replace the obligations Judge Rubin had imposed upon State Defendants with his 1985 decision. As is indicated above, after Judge Rubin had issued his decision in 1985 and had ruled upon a post-judgment motion filed by the State Defendants, both the Dayton Defendants and the Superintendent of Public Instruction, the only State Defendant against whom liability had been imposed, appealed. While those appeals were pending, the parties were able to reach a settlement, and, after the Sixth Circuit had granted their joint motion to remand, for the purpose of allowing that settlement to be approved by the Court in the form of a Consent Judgment, Judge Rubin entered that Judgment on December 9, 1987. In the Consent Judgment, the parties addressed both past and future desegregation costs, both of which Judge Rubin had previously ordered the parties to share equally. Paragraph 1 of the Consent Judgment quantified the State Defendants' liability for past expenses and established a time-table for the payment of that liability. Thus, the Consent Judgment clearly superseded and replaced the 1985 decision, as it related to previously incurred costs of desegregation, by capping the State Defendants' liability for past desegregation costs at a sum certain. Consequently, the question becomes whether the Consent Judgment can be read as merely addressing a single component of the State Defendants' liability for future expenses, because ¶ 2 was limited to transportation costs alone. It is unreasonable to construe the Consent Judgment as being so limited, merely because that agreed order only required the State Defendants to pay for 50% of future transportation costs, rather than for the same portion of expenses incurred through the use of other desegregation methods. Paragraph 4 of the Consent Judgment gave the Dayton Defendants the discretion to devise and to employ any programs it wished to reduce racial isolation.[21] Thus, while that agreed judgment contemplated that the Dayton Defendants might wish to employ means, other than transportation alone, to comply with the mandate that the Dayton Public Schools be desegregated, that judgment did not obligate the State Defendants to pay for any method other than transportation.[22] Accordingly, the Court concludes that the State Defendants' obligation to pay for desegregation costs, from an agreed upon date of July 1, 1986, forward, is limited by the Consent Judgment and that, therefore, they are presently obligated only to pay for 50% of the transportation costs incurred to desegregate the Dayton Public Schools. They were not obligated to pay any portion of any other expense incurred to meet that goal.[23] Since the 1987 Consent Judgment

21. In 1975 and 1976, when Judge Rubin issued his desegregation orders, he merely required that all schools within the Dayton system have a racial balance that was within 15%, plus or minus, of the racial balance of the district as a whole. That judicial officer left the Dayton Defendants with discretion on how to comply with that mandate.

22. Paragraph 5 of the Consent Judgment provided that the obligations imposed therein would not be affected by any past or future court order, requiring desegregation or the reduction of racial isolation. That paragraph also provided that the State Defendants would, prospectively, be relieved of its obligations under the Consent Judgment, to be replaced by any obligations imposed by a subsequent court order, if the Dayton Defen-

dants were found to have failed to comply with the desegregation decree entered in this litigation. That language, in no way, indicates that the Dayton Defendants had the right to request that the State Defendants pay for alternative methods of desegregation, such as the Educational Reform Plan.

23. The Dayton Defendants argue that the State Defendants, having been adjudged to be responsible for the unconstitutional segregation found to exist in the Dayton school system, may not be relieved of their obligation to dismantle that segregated system, until all vestiges of segregation have been eliminated. In support of that argument, the Dayton Defendants rely upon *United States v. Fordice*, 505 U.S. 717, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992). That litigation was a lawsuit to

established the parameters of the State Defendants' liability for desegregation costs after July 1, 1986, by superseding the more open-ended, 1985 order, the Court must first determine whether the Dayton Defendants are entitled to relief from or to reopening of that agreed Judgment, pursuant to Rule 60(b) or *Rufo*, before it may address the merits of the Dayton Defendants' Motion to Secure Additional Relief (Doc. # 274).

 Rule 60(b), under which a party may obtain relief from a judgment, provides, in pertinent part:

(b) *Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.* On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation.

As can be seen from the foregoing language, the Dayton Defendants are unquestionably not entitled to relief from judgment under clauses (1), (2) or (3) of Rule 60(b), given that they filed the instant motion approximately 10 years after the Consent Judgment had been entered. In addition, since the Dayton Defendants have not argued that the Consent Judgment is void, Rule 60(b)(4) does not afford a basis for relief. That leaves for consideration clauses (5) and (6) of Rule 60(b).

In *Rufo*, the Supreme Court addressed the applicability of a portion of Rule 60(b)(5) ("it is no longer equitable that the judgment should have prospective application") to a request to modify a consent decree.[24] Therein, the plaintiffs, pretrial detainees, had brought that litigation, challenging the conditions at the Suffolk County, Massachusetts, jail. After a trial, the District Court, in 1973, found that the conditions in the jail violated the plaintiffs' rights and ordered the defendants to cease the practice of housing two pretrial detainees in a single cell and, by June 30, 1976, to stop housing pretrial detainees in that facility, altogether. In 1979, the parties entered into a consent decree aimed at alleviating conditions at that facility and

---

desegregate Mississippi's public universities. Therein, the Supreme Court held that Mississippi would not discharge its constitutional obligations, "until it eradicates policies and practices that are traceable to its prior *de jure* dual system that continue to foster segregation." *Id.* at 728, 112 S.Ct. 2727. *Fordice* is distinguishable from this litigation, since it arose in the context of a decision by the District Court, which had been affirmed by the Court of Appeals, that the state had met its burden of dismantling its dual university system merely by adopting race neutral policies. Herein, the State Defendants are not suggesting that they should be relieved of

those obligations, flowing from Judge Rubin's conclusion that they were liable and the 1987 Consent judgment; rather, another group of Defendants, as opposed to the Plaintiffs-victims of the State Defendants' constitutional violations, has requested that the State Defendants be required to pay for 50% of an Educational Reform Plan, the implementation of which no court has ordered.

**24.** The *Rufo* Court also quoted Rule 60(b)(6); however, the standards it adopted were limited to Rule 60(b)(5).

constructing a new jail. That consent decree provided, *inter alia,* that each pretrial detainee would be housed in a separate cell. Due to delays in commencement of construction and an unexpected increase in the number of pretrial detainees who would be housed in the new jail, the consent decree was modified in 1985, to permit the construction of a larger detention facility; however, the requirement that pretrial detainees be housed in separate cells remained in the modified consent decree. In 1989, while the new jail was under construction, the defendants requested that the District Court modify the consent decree to permit double bunking of a number of pretrial detainees in that facility, in order to increase its capacity. The District Court, relying upon *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), concluded that the defendants were required to show a grievous wrong caused by new and unforeseen circumstances, in order to be entitled to the requested relief. Since the defendants had failed to make that showing, the District Court denied the requested modification, a decision with which the Court of Appeals agreed. On appeal, the Supreme Court concluded that the District Court had applied the wrong standard. Rather, than the grievous wrong standard, the *Rufo* Court held that a party requesting modification of a consent decree, pursuant to Rule 60(b)(5), bears the burden of establishing "that a significant change in the facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances." 502 U.S. at 393, 112 S.Ct. 748.

Herein, the Dayton Defendants have not even alleged in their motion that there has been a significant change in the facts,[25] which would warrant modification of the 1987 Consent Judgment to increase substantially the financial obligation that the State Defendants undertook by entering into that agreed order. In 1987, the Dayton Defendants were under an court order to operate their school system in a manner so that each school had a racial balance of plus or minus 15% of the district as a whole. That obligation, unaltered, remains in effect today. Moreover, the Plaintiffs have not sought any form of additional relief, which arguably could constitute a changed factual circumstance warranting modification of the Consent Judgment. On the contrary, the Dayton Defendants, who have been responsible for implementing Judge Rubin's desegregation decree, have unilaterally concluded that vestiges of segregation remain in the Dayton Public Schools, which can be eliminated only through the Educational Reform Plan. It bears emphasis that those vestiges of the formerly segregated Dayton Public Schools existed in 1987, when the parties entered into the Consent Decree. If there has been one factually changed circumstance since 1987, it is the self-professed failure of the Dayton Defendants to eliminate segregation from their school system in the intervening twelve year period of time. That failure does not warrant the modification of the 1987 Consent Judgment, in order to require the State Defendants to compensate the Dayton Defendants for their shortcomings. Accordingly, the Court concludes that there have not been significant changes warranting the modification of the 1987 Consent Judgment.

Moreover, bearing in mind that the Dayton Defendants are requesting that the Court increase the burdens imposed upon the State Defendants by the 1987 Consent Judgment, it is questionable whether this Court could grant that requested relief, even if there had been significant factual changes. In *Lorain NAACP v. Lorain Board of Education,* 979 F.2d 1141 (6th Cir.1992), a school desegregation case, the

25. In addition, the Dayton Defendants have not cited a decision by any court, after the entry of the Consent Judgment in 1987, which significantly changed the legal landscape concerning school desegregation litigation in a manner that would suggest that it is appropriate to impose a greater financial burden upon the State Defendants.

Lorain Board of Education and the Ohio Department of Education entered into a consent decree, in 1984, under which the state voluntarily agreed to contribute up to $1,000,000 to desegregate the Lorain schools. In 1991, the District Court, at the request of the Lorain Board of Education, modified that consent decree, eliminating the $1,000,000 cap and requiring the Ohio Department of Education to contribute $9,000,000. Upon appeal, the Sixth Circuit concluded that the District Court had improperly modified the consent decree, writing:

> While we express no opinion on the question of what constitutes a typical modification request, we think it obvious that the law should assign great significance to whether a party seeking modification requests relaxation of the terms of consent decree or the imposition of additional burdens and obligations. For example, Fed.R.Civ.P. 60(b) allows for relief from the terms of a consent decree where the terms are no longer equitable. [citing *Rufo* ] There appears no comparable provision addressing a party's request for an increase in the burdens of a consent judgment.

*Id.* at 1152–53. Quite obviously, the request at issue would materially increase the burdens on the State Defendants. Accordingly, the Court concludes that Rule 60(b)(5) does not serve as the basis for providing relief to the Dayton Defendants from the 1987 Consent Judgment.[26]

Finally, Rule 60(b)(6) does not provide an avenue to modify the 1987 Consent Judgment. In *Olle v. Henry & Wright Corp.*, 910 F.2d 357 (6th Cir.1990), the Sixth Circuit reiterated that "Rule 60(b)(6) should apply only in exceptional or extraordinary circumstances which are not addressed in the first five numbered clauses of the Rule." *Id.* at 365 (internal quotation marks and citation omitted). *Accord, Cincinnati Insurance Co. v. Byers*, 151 F.3d 574, 578 (6th Cir.1998). The *Olle* court also indicated that courts may employ Rule 60(b)(6) only "as a means to achieve substantial justice when something more than one of the grounds contained in Rule 60(b)'s first five clauses is present." 910 F.2d at 365 (internal quotation marks and citation omitted). Given that this Court has concluded that the Dayton Defendants are not entitled to relief under Rule 60(b)(5), which according to the *Rufo* Court provides the appropriate procedural mechanism for modifying a consent decree, that group of Defendants has not asserted that "something more" or exceptional or extraordinary circumstances are present so as to warrant relief from judgment under Rule 60(b)(6).

In sum, the Court concludes that the State Defendants' obligations are limited by the 1987 Consent Decree, a Decree which wholly supersedes Judge Rubin's open-ended, 1985 order apportioning the

26. The State Defendants also argue that the Consent Judgment is nothing more than a money judgment, which cannot be reopened under Rule 60(b). Although this argument is directed at Rule 60(b), generally, it is appropriately addressed in connection with the Court's discussion of the fifth clause of that Rule, which, *inter alia*, permits a court to grant relief from judgment "when it is no longer equitable that the judgment should have prospective application." Courts have interpreted that language as precluding the use of Rule 60(b)(5) to relieve a party from a money judgment, since such a judgment does not have prospective application. *See e.g., Stokors S.A. v. Morrison*, 147 F.3d 759 (8th Cir.1998); *Maraziti v. Thorpe*, 52 F.3d 252 (9th Cir.1995). *See also, Norgaard v. Depuy*

*Orthopaedics, Inc.*, 121 F.3d 1074 (7th Cir. 1997) (Plaintiff may not employ Rule 60(b)(5) to obtain relief from dismissal of claim seeking money damages, since dismissal not does apply prospectively). Since the Consent Judgment herein applies prospectively, this Court does not accept the State Defendants' assertion that it is merely a money judgment. Although that agreed judgment established the liability of the State Defendants for desegregation expenses previously incurred (a portion of the order which the Dayton Defendants do not seek to modify), it also imposed a continuing obligation upon that group of Defendants to pay for 50% of the transportation costs incurred in the future to comply with Judge Rubin's desegregation decree.

costs of desegregation between the Dayton and the State Defendants. As a consequence, the Dayton Defendants must demonstrate that they are entitled to relief from that agreed judgment, under Rule 60(b) and *Rufo*, in order for this Court to have the authority to address the merits of their Motion to Secure Additional Relief (Doc. # 274). Since the Dayton Defendants have not made such a showing, the Court concludes that it is without authority to entertain that motion.

## C. Eleventh Amendment

Even if this Court could, pursuant to Rule 60(b) and *Rufo*, entertain the Dayton Defendants' Motion to Secure Additional Relief, it would conclude, for reasons which follow, that the Eleventh Amendment to the United States Constitution bars it from exercising jurisdiction over that motion. In ruling upon the State Defendants' jurisdictional challenge to that motion, it is vital to note that the Plaintiffs are not the parties who are asserting that the desegregation order (Doc. # 121), entered by Judge Rubin in 1976 and ultimately affirmed by the Supreme Court in *Dayton II*, has failed to eliminate the last vestiges of the dual system which the Dayton Defendants had operated, and, based upon that assertion, requesting that the Court order the State Defendants to fund 50% of the necessary remedy. Therefore, this Court is not faced with a request from the Plaintiffs that the State Defendants contribute financially to remedying the unconstitutional violations, for which they have been found to be jointly responsible with the Dayton Defendants. Rather, it is the Dayton Defendants, having long ago been adjudged to have violated the Equal Protection Clause of the Fourteenth Amendment, who have filed a motion with which they request that the Court order the State Defendants to fund 50% of a

reform program, which the Dayton Defendants contend will at last eliminate the final vestiges of segregation from the dual system which they (the Dayton Defendants) have operated, despite the fact that they have been under a court order to eliminate segregation for more than two decades.

The Eleventh Amendment to the United States Constitution prohibits federal courts from entertaining lawsuits against the states. *See generally Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). An important exception to that prohibition was recognized in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), wherein the Supreme Court held that a federal court possessed jurisdiction to hear a suit against an officer of a state, sued in his official capacity, to enjoin a violation of the United States Constitution. In *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), the Supreme Court applied *Ex Parte Young* in a school desegregation case. Therein, as the appropriate remedy to desegregate the Detroit school system, the District Court, *inter alia*, adopted a program of remedial and compensatory education for children who had been subjected to previous acts of *de jure* segregation, and ordered state officials to pay half of the cost of the program.[27] After the Sixth Circuit affirmed, the Supreme Court held that ordering state officials to pay for a portion of the costs of the program did not violate the Eleventh Amendment, since it merely required the state officials to comply prospectively with the requirements of the law and, therefore, came within *Ex Parte Young*, even though there was an "direct and substantial impact on the state treasury." *Id.* at 289, 97 S.Ct. 2749.

27. That remedy was ordered after the Supreme Court had reversed the previously imposed remedy of metropolitan-wide busing and had remanded the matter for further proceedings, "leading to [the] prompt formula-

tion of a decree directed to eliminating the segregation found to exist in the Detroit city schools." *Milliken v. Bradley*, 418 U.S. 717, 753, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

778

The Dayton Defendants argue that, in accordance with *Milliken,* the Eleventh Amendment does not prevent this Court from entertaining their Motion to Secure Additional Relief (Doc. # 274). This Court does not agree. There are significant differences between this case and *Milliken.* For instance, the program in *Milliken* was adopted as part of the initial remedy, whereas, herein, the Dayton Defendants seek to have this Court require the State Defendants to fund their Educational Reform Plan, which will contain some of the same components of the program at issue in *Milliken,* more than 20 years after Judge Rubin entered his order to eliminate segregation from the Dayton Public Schools. As is discussed below, the Sixth Circuit has interpreted *Milliken* to allow a District Court to require a state to pay for the type of relief, now sought by the Dayton Defendants, only when that relief is ancillary to an order granting prospective injunctive relief. *Kelley v. Metropolitan County Board of Education of Nashville and Davidson County,* 836 F.2d 986 (6th Cir.1987), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988). Given that the Dayton Defendants are seeking such relief more than 20 years after prospective injunctive relief was granted, this Court cannot conclude that the relief now sought is ancillary to that injunction. Moreover, the Dayton Defendants do not seek to remedy an ongoing constitutional violation by the State Defendants, there being no assertion that the State Defendants have done anything to cause the Dayton Public Schools to continue to be segregated, more than 20 years after Judge Rubin issued his desegregation decree. On the contrary, as a result of being partially responsible for the segregated conditions found to exist in the Dayton Public Schools more than 20 years ago, the State Defendants were obligated, by the 1987 Consent Judgment, to pay for $25,-146,834 of the desegregation costs incurred by the Dayton Defendants, through June 30, 1986, and 50% of the transportation costs incurred thereafter to desegregate

the Dayton Public Schools. The State Defendants have met and continue to meet their obligations under that agreed Judgment. Thus, rather than being ancillary to an ongoing constitutional violation by the State Defendants, the Dayton Defendants' motion is ancillary only to their self-professed failure, over the past 20 plus years, to root out segregation from the Dayton school system.

Moreover, in an analogous case, the Sixth Circuit held that, despite *Milliken,* the Eleventh Amendment prohibited the District Court from entering an order requiring the State of Tennessee and its officials to pay for a portion of the desegregation costs incurred by the local school district. *Kelley, supra.* Therein, the defendant, a local board of education, filed a third-party complaint against the State of Tennessee and state officials in their official capacity, 26 years after the inception of that litigation, seeking contribution for the expenses, which had previously been incurred and which would be incurred in the future, to desegregate the formerly segregated school system. The District Court ruled that, although the Eleventh Amendment prohibited a retroactive award for previously incurred expenses, the state and its officials were liable for 60% of such expenses that would be incurred in the future. Upon appeal, the Sixth Circuit concluded that the Eleventh Amendment prohibited the District Court from ordering the state or its officials to compensate the local school board for either the past or the future costs, which the local board had incurred and would incur in the future to desegregate its schools. Initially, as in the issue framed by the Dayton Defendants' request herein, the Sixth Circuit noted that it had not been called upon to adjudicate the rights of plaintiffs who are alleged to have been harmed by a segregated school system; rather, they were called upon to resolve a dispute between a state and one of its political subdivisions over who would pay for the remedies required to desegregate

that system, based upon a finding of unconstitutional segregation made many years in the past. The Sixth Circuit distinguished *Milliken* on the basis that, therein, the state had been required to fund a desegregation plan in the context of a court ordered remedy to eliminate segregation, while the local school district in the Tennessee case was seeking contribution many years after such a remedy had been ordered. Thus, while under the authority of *Milliken*, the Eleventh Amendment did not prohibit a federal court from ordering state officials to expend funds, where that expenditure was ancillary to the entry of an order granting prospective injunctive relief, issued immediately or shortly after a finding of liability, the order entered in *Kelley* was not ancillary to such an order. 836 F.2d at 992. The Sixth Circuit also concluded that it was inappropriate for a District Court "to adjudicate an internal dispute between a local governmental entity and the very state that created it." 836 F.2d at 998.[28]

Other appellate courts have followed the decision of the Sixth Circuit in *Kelley*. For instance, in *DeKalb County School District v. Schrenko*, 109 F.3d 680 (11th Cir.1997), the Eleventh Circuit concluded that the Eleventh Amendment prohibited the District Court from adjudicating the claim of a local school board to recover, from state officials, costs incurred to desegregate the schools. Therein, the Court of Appeals stressed that principles of comity and federalism, which underlie the Eleventh Amendment, prohibited the District Court from entertaining a suit, by a political subdivision against the state that created it over the division of public funds:

A state's power to create, abolish and determine the level of public funding of political subdivisions has long been recognized as an element of state sovereignty. *See, e.g., City of Trenton v. State of New Jersey*, 262 U.S. 182, 186, 43 S.Ct. 534, 67 L.Ed. 937 (1923). As the Fourth Circuit Court of Appeals observed in a similar case involving the funding of local school desegregation measures, "[i]t would be an unfathomable intrusion into a state's affairs—and a violation of the most basic notions of federalism—for a federal court to determine the allocation of a state's financial resources. The legislative debate over such allocation is uniquely an exercise of state sovereignty." *Stanley v. Darlington County School District*, 84 F.3d 707, 716 (4th Cir.1996); *see also Harris v. Angelina County, Texas*, 31 F.3d 331, 340 (5th Cir.1994) ("we can think of few greater intrusions on state sovereignty than requiring a state to respond, in federal court, to a claim for contribution brought by one of its own counties"), *Kelley v. Metropolitan County Board of Education of Nashville & Davidson County*, 836 F.2d 986, 998 (6th Cir.1987), *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988) (federal court may not "be called upon to adjudicate an internal dispute [over local school funding] between a local governmental entity and the very state that created it").

*Id.* at 689–90.[29] In *Rockford Board of Education v. Illinois State Board of Education*, 150 F.3d 686 (7th Cir.1998), the Seventh Circuit held that the District

---

**28.** The Dayton Defendants argue that *Kelley* is not persuasive and to support that assertion cite *San Francisco NAACP v. San Francisco Unified School District*, 695 F.Supp. 1033 (N.D.Cal.1988), *reversed on other grounds*, 896 F.2d 412 (9th Cir.1990), wherein the District Court interpreted a consent decree, to which the state was a party, as requiring the state to pay for all costs incurred to desegregate the San Francisco school system. In the course of its decision, the District Court was critical of *Kelley*, which it declined to follow. Putting

aside for a moment the fact that the District Court was reversed in that case (albeit for reasons unrelated to the Sixth Circuit's analysis of the Eleventh Amendment in *Kelley*), this Court is not free to ignore the decisions of the Sixth Circuit.

**29.** It bears emphasis that the Dayton Board of Education is a political subdivision of the state of Ohio.

Court had properly declined to exercise jurisdiction over a lawsuit, which a local school district had filed against state officials in order to recover a portion of the expenses that the local district anticipated it would incur to desegregate. The Seventh Circuit distinguished *Milliken* on the same basis as had the Sixth Circuit in *Kelley, supra. See also, Stanley v. Darlington County School District,* 84 F.3d 707 (4th Cir.1996).

Herein, the Dayton Defendants sought to distinguish cases, such as *Kelley,* on the fact that state officials were not named as defendants in the original desegregation lawsuits; rather, in those actions, local school districts sought to obtain contribution from the state, long after the initial desegregation suit had been filed, and liability adjudicated against the original named defendant or defendants. Herein, in contrast, the State Defendants were initially joined as defendants in this litigation. In addition, Judge Rubin found that the State Defendants had violated the Plaintiffs' rights and that, therefore, they were liable for 50% of both past and future desegregation costs.[30] *Brinkman v. Gilligan,* 610 F.Supp. 1288 (S.D.Ohio 1985). Thus, the procedural history of this case differs from those of the cases discussed above, such as *Kelley.* Nevertheless, this Court does not consider those differences to constitute the basis for declining to recognize both *Kelley* as controlling herein and similar cases as persuasive authority. Despite those differences, this litigation is similar to cases such as *Kelley,* in the important aspect that a local school district is seeking to have a federal court enter an order, requiring the state to pay for costs of desegregation, long after the original court ordered remedy had been entered. In other words, the scenario presented by the Dayton Defendants' motion, like that in *Kelley* and similar cases, involves not only a dispute between a state and a politi-

cal subdivision which is a creature of that state, but also a situation where the requested order is *not* ancillary to the initial court ordered remedy. The above similarity is sufficient to cause this Court to conclude that it must follow *Kelley.*

Nevertheless, the Dayton Defendants contend that this Court should disregard *Kelley* and other similar cases and should follow decisions in which courts have held that a District Court may order state officials to pay for a portion of the remedy needed to cure a constitutional violation. Even if this Court could decline to follow the Sixth Circuit's decision in *Kelley, supra,* which it cannot, it would conclude that the cases cited by the Dayton Defendants do not support the basic premise that, consistent with the Eleventh Amendment, the State Defendants can be ordered to fund 50% of the Educational Reform Plan. For instance, in *Alberti v. Sheriff of Harris County, Texas,* 937 F.2d 984 (5th Cir. 1991), the Fifth Circuit held that the District Court could order the state to pay for a portion of the remedy necessary to alleviate the unconstitutional conditions existing in the Harris County jails. That lawsuit had been pending for a number of years, and the plaintiffs and local authorities had entered into a number of agreements aimed at curing the unconstitutional conditions in those jails, such as building new facilities and limiting the population of inmates. During the same period, the state of Texas was engaged in litigation, concerning the conditions of its prisons. To remedy the asserted constitutional infirmities in its prison system, Texas agreed to limit the population in its institutions. To accomplish that end, Texas prevented counties, such as Harris County, from transferring convicted felons to state institutions. As a result, the population of Harris County's jails increased, and the *Alberti* plaintiffs sought further relief in

---

**30.** Judge Rubin's Order was subsequently replaced with the Consent Judgment (Doc. # 273), under which the State Defendants were liable for 50% of transportation costs (as

opposed to any other type of expense) incurred in the future to desegregate the Dayton school system.

the District Court, from both the local authorities and the state. The District Court ultimately ordered that a number of the prisoners in the Harris County jails, who had been convicted of felonies and were awaiting transfer to a state institution, be transferred to other counties and that the state be required to pay for the costs incurred as a result. The Fifth Circuit concluded that the District Court could require state to pay such costs, since it was the cause of the constitutional deprivation (overcrowding in the Harris County jails) being experienced by the plaintiffs. This litigation is unquestionably distinguishable from the circumstances of *Alberti*. Herein, the Dayton Defendants seek to remedy a constitutional deprivation which flows from their own failure to root out the last vestiges of unconstitutional segregation from the Dayton school system, despite being under a court order to do so since the 1970's. Thus, unlike *Alberti*, where the state directly caused the constitutional deprivation (an overcrowded jail), by refusing to allow local officials to transfer convicted felons to state institutions, the State Defendants herein are not the direct cause of the constitutional deprivation which the Dayton Defendants seek to remedy. Moreover, in *Alberti*, the plaintiffs, the victims of the constitutional deprivation, requested the relief, whereas, herein, one group of Defendants seeks to shift to the state the expense of remedying the constitutional violation, for which that group of Defendants is more than equally responsible and which that group has neglected to rectify.

The Dayton Defendants also cite *Oliver v. Kalamazoo Board of Ed.*, 640 F.2d 782 (6th Cir.1980). Therein, plaintiffs sought and received a preliminary injunction, requiring the local school board to transport students to achieve racial balance in the Kalamazoo school system. After that relief had been affirmed by the Sixth Circuit, the District Court made its preliminary injunction permanent, holding state officials jointly and severally liable, with the local school board, for the unconstitutional

conditions found to exist in that school system. The Sixth Circuit also affirmed the entry of permanent injunctive relief. Thereafter, the District Court conducted proceedings on the plaintiffs' request for additional ancillary relief, including the continuation of a program that had previously been funded by the federal government, under the Emergency School Aid Act ("ESAA"), 20 U.S.C. § 1601, *et seq.* The local school district, in turn, requested that the state of Michigan be required to fund the continuation of the ESAA program. The District Court agreed with both the plaintiffs and the local board of education, ordering that the program be continued and that it be funded by the state. Upon appeal, the Sixth Circuit reversed, concluding that there was no evidence that continuation of the ESAA program was needed in order to remedy a violation of the Fourteenth Amendment. However, in the course of its decision, the Sixth Circuit concluded, in dicta, that the District Court had authority, under *Milliken*, to order the state and the local board of education to pay for the continuation of the ESAA program, which the plaintiffs had requested as a form of relief ancillary to the original desegregation order and the ongoing violations by those two entities. Herein, the Plaintiffs have not requested any such relief or any relief at all, and the requested order is not ancillary to Judge Rubin's original desegregation decree.

In sum, this is not an instance where plaintiffs, who have prevailed over a state and a political subdivision thereof in a desegregation suit, request that the Court enter further relief, in order to eliminate the last vestiges of the segregated system. Rather, it is a local school district that has been under a court imposed desegregation order for more than 20 years which has sought such relief. The Dayton Defendants do not seek to remedy an ongoing constitutional violation by the State Defendants. There is no assertion that the State Defendants have done anything to cause the Dayton Public Schools to contin-

ue to be segregated, more than 20 years after Judge Rubin issued his desegregation decree. On the contrary, as a result of being partially responsible for the segregated conditions found to exist in the Dayton Public Schools more than 20 years ago, the State Defendants were obligated, by the 1987 Consent Judgment, to pay for $25,146,834 of the desegregation costs incurred by the Dayton Defendants, to desegregate the Dayton Public Schools. The State Defendants have met and continue to meet their obligations under that agreed Judgment. Accordingly, the Dayton Defendants' Motion to Secure Additional Relief (Doc. # 274) does not come within *Ex Parte Young*, as elaborated upon in *Milliken*, since that motion is ancillary only to those Defendants' failure to root out the last vestiges of segregation from the Dayton school system, rather than to prospective injunctive relief, remedying an ongoing constitutional violation by the State Defendants. This Court has concluded that such a request is governed by *Kelley, supra*, and other similar decisions and that, therefore, the Eleventh Amendment prevents it from exercising jurisdiction over that request.[31]

### D. Judicial Estoppel

As is indicated above, the predicate of the Dayton Defendants' Motion to Secure Additional Relief (Doc. # 274) is their belief that 20 years of operating the Dayton Public Schools under Judge Rubin's desegregation decree has not succeeded in eliminating the last vestiges of segregation. The State Defendants argue that the Dayton Defendants are judicially estopped from arguing that the Dayton Public Schools are segregated, because that group of Defendants previously advocated the opposite position in this litigation. It cannot be controverted that, until the Supreme Court issued its decision in *Dayton II*, the Dayton Defendants argued that the Dayton Public Schools were not segregated. Nevertheless, this Court cannot agree that the doctrine of judicial estoppel prevents the Dayton Defendants from taking a position which is inconsistent with that which they advocated from 1972, when this case was filed, through 1979, when the Supreme Court decided *Dayton II*. In *Teledyne Industries v. N.L.R.B.*, 911 F.2d 1214 (6th Cir.1990), the Sixth Circuit reiterated that "the doctrine of judicial estoppel forbids a party from taking a position inconsistent with one *successfully* and unequivocally asserted by the same party in a prior proceeding." *Id.* at 1217 (internal quotation marks and citation omitted; emphasis supplied). That equitable doctrine "preserves the integrity of the courts by preventing a party from abusing the judicial·process through cynical gamesmanship, *achieving success on one position*, then arguing the opposite to suit the exigency of the moment." *Id.* at 1217–18

---

**31.** In its Submission Concerning Jurisdiction (Doc. # 284), the NAACP argues that this Court has jurisdiction to entertain the motion seeking additional relief. The Court does not agree. For instance, the NAACP cites the school desegregation litigation involving ·Yonkers, New York, as an example of where a court exercised jurisdiction over a request for additional relief, from state officials, which was made after an initial desegregation order had been entered. *United States v. City of Yonkers*, 96 F.3d 600 (1996), *cert. denied*, 521 U.S. 1104, 117 S.Ct. 2479, 138 L.Ed.2d 988 (1997). The distinction between the Yonkers litigation and this case is that, therein, the plaintiffs requested the additional relief, while the Plaintiffs in this litigation have not. The requested relief was, therefore, arguably an-

cillary to the initial court ordered remedy. In addition, herein, the NAACP argues that it has never acquiesced to the dismissal of its claims against the State Defendants. While *City of Yonkers* and the premise of the NAACP that it did not acquiesce in the dismissal of its claims against the State Defendants might support the exercise of jurisdiction over a request for additional relief by the Plaintiffs, it does not mean that this Court has jurisdiction to entertain such a request from the Dayton Defendants. Thus, while it is conceivable that this Court could exercise jurisdiction over a request for additional relief made by the Plaintiffs, it is not necessary to consider that question at this time, since the Plaintiffs have not filed a motion seeking such relief.

(emphasis supplied).[32] In *Griffith v. Wal–Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir.1998), the Sixth Circuit stressed that judicial estoppel applies only when a party succeeds in showing that his opponent previously took an inconsistent position that was accepted by the court. Herein, although the Dayton Defendants have previously taken the position that the Dayton school system was not unconstitutionally segregated, the history of this litigation, which is set forth above in some detail, most definitely shows that the Dayton Defendants' previous position was *not accepted* by either the Sixth Circuit or the Supreme Court. *See Brinkman IV, supra; Dayton II, supra.* Accordingly, the Court rejects the argument of the State Defendants that the doctrine of judicial estoppel prevents this Court from entertaining the Motion to Secure Additional Relief (Doc. # 274).

### E. Principles of Federalism and Comity

█ In addition to arguing that the Eleventh Amendment divests this Court of subject matter jurisdiction to address the Dayton Defendants' Motion to Secure Additional Relief (Doc. # 274), the State Defendants assert that principles of federalism and comity caution against the exercise of such jurisdiction, even if the Eleventh Amendment does not deprive this Court of same. With that assertion, the State Defendants cast the Dayton Defendants' motion as nothing more than a dispute between the state of Ohio and one of its political subdivisions over the issue of whether the Educational Reform Plan should be funded by the taxpayers who reside within the Dayton School District or by all Ohio taxpayers. So viewed, the State Defendants argue that the Dayton Defendants' motion constitutes nothing more that an "end-run" around the Ohio General Assembly's allocation of funds to support education. According to the State

Defendants, this Court would intrude upon the sovereignty of the state of Ohio, if it were to adjudicate this dispute between a state and one of its political subdivisions. In response, the Dayton Defendants argue that none of the cases cited by the State Defendants stand for the proposition that principles of federalism and comity prevent a District Court from exercising its jurisdiction to eradicate the last vestiges of segregation from a school system. This Court agrees with the Dayton Defendants.

Above, this Court has concluded that the Dayton Defendants' Motion to Secure Additional Relief is barred by the Eleventh Amendment. To reach that conclusion, the Court has relied upon the decision of the Sixth Circuit in *Kelley, supra,* as well as decisions by other Circuits. *See e.g., DeKalb County School District, supra.* In those decisions, the courts held that the Eleventh Amendment prevented the District Court from entertaining a request by a local school district to require the state, which had created that school district, to pay a portion of the expenses that the local district had incurred to comply with a desegregation order. Although those decisions were supported by the principles of federalism and comity which serve as the foundation of the Eleventh Amendment, neither the Sixth nor any other Circuit has held that federalism and comity, separate and distinct from the Eleventh Amendment, served as a sufficient, independent basis for declining to order the requested relief. Accordingly, the Court concludes that principles of federalism and comity, independent of the Eleventh Amendment, would not prevent this Court from entertaining the Dayton Defendants' Motion to Secure Additional Relief (Doc. # 274).

In sum, this Court has concluded that the Dayton Defendants are not entitled to relief from the 1987 Consent Judgment, under either Rule 60(b) or *Rufo,* and, fur-

---

**32.** In a footnote, the *Teledyne* court explained that the doctrine of judicial estoppel does not conflict with Rule 8(e)(2) of the Federal Rules of Civil Procedure, which permits a party to plead inconsistent theories, because "judicial estoppel does not bar a party from contradicting itself, but from contradicting a court's determination that was based on that party's position." 911 F.2d at 1217–18 n. 3.

ther, that even if such relief were available, the Eleventh Amendment would prevent this Court from entertaining their Motion to Secure Additional Relief (Doc. # 274). No matter the merits of the Educational Reform Plan, which are considerable, this Court is without jurisdiction to order the state to pay for its implementation. Accordingly, the Court overrules the Dayton Defendants' Motion to Secure Additional Relief (Doc. # 274).

## III. Motion to Modify Student Assignment Plan (Doc. # 275)

With this motion, the Dayton Defendants request that the Court approve a plan, whereby the system of assigning students will be modified in the manner described above. The State Defendants argue that this Court lacks jurisdiction to address this request for modification. The Court does not agree.

The State Defendants have raised a number of challenges to this Court's jurisdiction over the Dayton Defendants' Motion to Modify Student Assignment Plan (Doc. # 275). Those arguments are contained in the same memorandum in which they have argued that the Court was without jurisdiction to hear the Dayton Defendants' Motion to Secure Additional Relief (Doc. # 274). The focus of their memorandum is clearly on the latter motion. Indeed, it is apparent that many of those arguments were not intended to be consid-

ered as challenges to the request for modification.[33] The Court, therefore, deems it unnecessary to address all of the State Defendants' assertions. It will, however, briefly address their underlying concern that the motion seeking modification, like that requesting additional relief, could require them to pay an additional amount of money to desegregate the Dayton Public Schools. The State Defendants emphatically insist that this Court is without jurisdiction to order them to contribute such an increased amount. Given that the parties have not yet submitted evidence on the issue of whether approval of the Defendants' Motion to Modify Student Assignment Plan would cause the State Defendants to incur additional costs, let alone whether the Court should approve that motion, the Court deems it premature to address the question of whether it has jurisdiction to enter such an order. If the Court should grant the Dayton Defendants' request for modification, and if it appears that such a decision will cause the State Defendants to incur additional costs, those Defendants may argue, at that time, that this Court is without jurisdiction to enter such an order.[34]

Since the desegregation order issued by Judge Rubin remains in effect in this litigation, *Dowell* commands the conclusion that this Court has jurisdiction to address the Dayton Defendants' request to modify the student assignment plan, notwithstand-

**33.** For instance, the State Defendants argue that the Dayton Defendants are without standing, since they are asserting the rights of the Plaintiffs. Unquestionably, that argument is directed solely against the Motion to Secure Additional Relief, rather than that seeking modification of the student assignment plan.

**34.** Given the Court's conclusion that it is without jurisdiction to entertain the Dayton Defendants' Motion to Secure Additional Relief (Doc. # 274), the Court is not suggesting that it would have jurisdiction to order the State Defendants to pay additional costs, if the Motion to Modify School Assignment Plan (Doc. # 275) should be granted. However, it bears emphasis that the Motion to Modify School Assignment Plan differs dramatically from the Motion to Secure Additional Relief. With the latter motion, the Dayton Defendants

request that this Court impose significant monetary liability upon the State Defendants. With the former motion, the Dayton Defendants merely request that the Court permit them to assign students in a manner that differs from the plus or minus 15% standard established by Judge Rubin in 1976. Assuming for sake of argument that the Eleventh Amendment would prevent this Court from ordering the State Defendants to pay additional transportation costs, if it should approve the request for modification, such a conclusion does not mean that the Court is without jurisdiction even to consider that request, particularly when no one can know whether such approval will cause transportation costs to increase, to decrease or to remain the same.

ing the State Defendants' fear that they may incur additional expenses, just as it has jurisdiction to return complete control of the Dayton Public Schools to those Defendants when unitary status has been achieved. Moreover, in his Order of March 23, 1976, Judge Rubin indicated that said Order should not be construed as a bar to the submission of any other desegregation plan and that he would "at all times entertain a motion by any party for consideration of any specific procedure." That language, above and beyond *Dowell,* clearly establishes that this Court retains the jurisdiction to entertain the Dayton Defendants' Motion to Modify School Assignment Plan (Doc. # 275).

Accordingly, the Court concludes that it may exercise jurisdiction over the Dayton Defendants' Motion to Modify School Assignment Plan (Doc. # 275). The Court schedules a telephone conference call for Monday, June 28, 1999, at 8:30 a.m., for the purpose of establishing procedures for the resolution of this request.